JOSEPH B. FERGUSON, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 92137. Filed October 17, 1966.

12

*Leonard Belford* and *Harvey M. Sklaver*, for the petitioner.
*Warren S. Shine* and *Paul H. Frankel*, for the respondent.

HOYT, *Judge:* Respondent determined an income tax deficiency against petitioner, Joseph B. Ferguson, for the year 1959 in the amount of $1,191.52. In various amendments to his answer filed herein, respondent asserted certain increased deficiencies totaling in excess of $310,000.

After various concessions by respondent at trial and on brief, the only questions remaining for decision are: (1) Whether certain payments totaling $132,592 made by Fergus Imported Cars, Inc., in 1959 represented taxable income to petitioner, and (2) whether interest income earned in 1959 by funds on deposit in a certain savings account was taxable to petitioner.

### FINDINGS OF FACT

Some of the facts have been stipulated in writing, and some by oral stipulation at trial. All stipulated facts are incorporated herein by this reference.

Petitioner is an individual residing at 1717 Broadway in New York City. His Federal income tax return for the taxable year 1959 was filed with the district director, Manhattan, N.Y.

Petitioner is judicially separated from his wife pursuant to a final judgment, dated April 21, 1941, entered in a New York State court. Since 1941 petitioner has been in court many times in controversies

with his wife concerning the amount of alimony to be paid to her. Sometime prior to the tax year here in question petitioner opened and thereafter used a bank account in the name of his deceased brother. This name was used so that petitioner's wife would not know of the account's existence.

Petitioner was born in 1880 near Belfast, Northern Ireland. As a youngster he was interested in mechanics and farm machinery, and at age 15 he began working in a Belfast machine shop, where he remained employed for 6 years. He left this apprenticeship in 1901 and opened his own mechanical repair shop. At this time the automobile was in its infancy and there were very few of them in Belfast. Petitioner took a keen interest in the then modern wonder of motor-driven vehicles, and his repair shop specialized in work on motorcycles and automobiles. In 1906 petitioner joined with his brother in opening up a larger shop so that they could get into the business of buying and selling cars on a bigger scale than theretofore.

Through several years of experience, petitioner and his brother became familiar with the mechanical and engineering shortcomings of the early automobiles, and they developed several improvements, on many of which they acquired patents. In 1914 they began construction of a new automobile, incorporating many of their improvements into what they thought would be the "ideal car." This new car, called the Fergus, had the following improvements over its contemporaries: The lubrication points were cut from 70 to about 10; the engine was suspended in rubber rather than attached directly to the frame, thus reducing vibration; the engine was smaller, yet developed more power than conventional engines; it had overhead valves rather than side valves.

The new Fergus received substantial publicity and in 1915 petitioner arranged to bring the car to the United States for a public exhibition at the Grand Central Palace in New York. As a result of this exhibit petitioner received backing from certain New York interests and a new corporation was formed in 1916, with a factory in Newark, N.J., to manufacture and improve the Fergus car. This corporation was called Fergus Motors of America, Inc. During and after the First World War, this corporation, led by petitioner, was called upon by the U.S. Government to carry out various developmental projects, primarily involving improvements in aircraft engines. Fergus Motors of America, Inc., received a citation from the War Department of the United States for distinguished service aiding materially in obtaining victory for the arms of the United States in World War I.

After the war, petitioner and his colleagues returned their attention to automobiles, and in 1921 they introduced at the Motor Sports Show

in New York, a new, improved model of the Fergus. This car was an improvement on the original 1914 Irish Fergus in that it contained a 6-cylinder engine instead of a 4-cylinder one, and it further decreased the number of lubrication points. The 1921 model was the first car ever to employ a thermostatically controlled automatic choke on the carburetor. The 1921 Fergus was advertised at $10,000, complete chassis only, f.o.b. Newark, with a 5-year comprehensive guarantee.

During his early years in America, petitioner was consulted by others in the automotive industry concerning various improvements which he and/or Fergus Motors of America, Inc., had developed. Chrysler Corp. paid for consultation concerning the rubber mounting of the automobile engine as originated on the 1914 Irish Fergus. Petitioner and his company did all the front suspension work on the Cord automobile. In a patent-infringement suit concerning an automatic choke carburetor petitioner was paid by General Motors and other defendants to appear as a defense witness and testify that he had displayed such a carburetor in the 1921 exhibit of the original Fergus, 10 years prior to the date the plaintiff in the case claimed to have invented it.

In 1940 petitioner formed Fergus Motors, Inc., a New York corporation (herein called Fergus Motors), and for many years prior to June 29, 1955, he was the sole owner of its stock and was its president. Fergus Motors was engaged primarily in the business of buying, selling, and servicing foreign cars. In their spare time, particularly on Saturdays, petitioner and some of the Fergus Motors employees would engage in experimental work on automobiles. Petitioner was also, for many years prior to June 29, 1955, the owner of all of the stock of 444 West 55th Street Corp., a New York corporation (herein called 444), which on that date owned three parcels of improved commercial real property as follows:

(a) 1717 Broadway, New York City (between West 54th and West 55th Streets), consisting of a basement used for an office and petitioner's residence, a main (street level) floor used by Fergus Motors for displaying automobiles, and a second floor rented to a third party,

(b) 444 West 55th Street, New York City, a six-story building occupied by Fergus Motors, and

(c) 138–140 West 54th Street, New York City, consisting of a five-story garage rented to a third party.

In addition to its space in the buildings listed above, Fergus Motors occupied a branch showroom on Park Avenue.

During 1954 Fergus Motors employed, *inter alia*, the following key men: Guy M. Stanfill, service manager; Milton Gold, parts manager; and Louis Santelli, Park Avenue salesroom manager. Peter

Fritz Dube had also been employed as assistant to the petitioner from January 1952 to March 1953.

Sometime prior to September 1954, when petitioner was approximately 75 years old, he approached Stanfill, Gold, and Santelli and told them that he was considering closing up his automobile business. He said that he was losing money, that he was getting old and tired, and that he wanted to spend more time with the automotive inventions and experimental work which had occupied much of his spare time over the years. He indicated that he would like to work out an arrangement with these key employees whereby, subject to certain conditions, they would buy or take over the operation of his automobile business. In September 1954, Gold told Dube, petitioner's former assistant who had left Fergus Motors in 1953, about petitioner's suggestion and invited Dube to join the others in the venture. Dube became the leader of the group which included Stanfill, Santelli, and Gold (hereinafter sometimes called the Dube group), and the group began negotiating with the petitioner for the acquisition of his business.

After over 6 months of give-and-take negotiations at which both sides were represented by counsel, on June 29, 1955, petitioner entered into an agreement (hereinafter referred to as the 1955 agreement) with the Dube group, pursuant to which the automobile business (all of the assets of Fergus Motors) and the stock in 444, the real estate corporation, were transferred to a newly organized New York corporation, Fergus Enterprises, Inc. (herein called Enterprises). Enterprises was to have a class A voting stock and a class B nonvoting stock, initial issuance of which were to be as follows:

| | Shares of class— | |
| --- | --- | --- |
| | A | B |
| Petitioner | 80 | 7, 920 |
| Stanfill | 3 | 22 |
| Dube | 3 | 7 |
| Santelli | 3 | 22 |
| Gold | 3 | 22 |
| Joseph B. Ferguson, Jr. | 3 | 7 |
| Totals | 95 | 8, 000 |

Joseph B. Ferguson, Jr., petitioner's son, was included in the transaction as a stockholder (and salaried employee) of Enterprises upon petitioner's insistence.

Prior to signing the 1955 agreement, an understanding was reached whereby petitioner would, at some time subsequent to the organization of Enterprises, transfer his 80 voting shares to the other five stockholders in exchange for the 80 nonvoting shares, so that ultimately the Dube group (and Ferguson, Jr.) would own all the voting stock. This exchange was subsequently effected by written

agreement dated February 9, 1956, after which petitioner owned all of the 8,000 outstanding nonvoting shares, and the other five stockholders owned all of the 95 outstanding voting shares. Though complete control was placed in the other five stockholders, petitioner's 8,000 nonvoting shares represented a 98.8-percent equity in the corporation, which he considered at least equal in value to the property he had transferred to Enterprises.

The 1955 agreement provided, *inter alia*, as follows (references in the quoted passages to "Ferguson" are to the petitioner, and references to "The undersigned" are to the Dube group and Joseph Ferguson, Jr.) :

4.a. Immediately upon organization of ENTERPRISES, FERGUSON shall be employed as consultant to the Corporation for the rest of his natural life and shall be in the head of and in full charge and control of the Experimental Division, which ENTERPRISES shall set up. FERGUSON shall receive such salary plus a bonus as may be determined by the Board of Directors, but in no event shall his salary or his bonus or any additional compensation be less than any of THE UNDERSIGNED, or of any officer of the proposed corporation.

\*　　\*　　\*　　\*　　\*　　\*　　\*

5.a. Immediately upon organization of ENTERPRISES, it shall set up an an Experimental Department, to be equipped with the machines and equipment now available which may be required by FERGUSON, which department shall occupy not less than one-fourth (1/4) of the space of the 6th floor of 444 West 55th Street, New York City, and provide the necessary heat, electricity, power and telephone service thereto. Said Experimental Department will be under the supervision and full and complete charge and control of FERGUSON. There shall also be set over to FERGUSON not less than one-third (1/3) of the basement space at 1717 Broadway, New York City in the portion of said premises, now occupied by FERGUSON, which space shall encompass that now occupied by FERGUSON, and also phone extension thereto, all the above free of rental, cost, expense or other charge, and as a consideration of the sale.

b.1. ENTERPRISES shall pay monthly on or before the 10th day of each month for the month immediately preceding from the gross cash income of all sources whatever of ENTERPRISES such sums of money as shall be equal to three (3%) percent of said gross cash income of ENTERPRISES as stated above, exclusive of salaries, bonuses and additional compensation as otherwise provided for herein, which shall be paid directly by ENTERPRISES to FERGUSON. Said payments shall be made to and deposited in a special and separate bank account, which shall be called ENTERPRISES Experimental Account or any other similar name, the disbursement of the money therein shall be under FERGUSON'S sole authority and discretion, providing same be for the benefit of said Experimental Department. FERGUSON shall have the expressed right to designate the disbursing agent and signatory of said special account. \* \* \*

c. The Fund so established shall be the total budget to said Experimental Department from said ENTERPRISES. The liabilities shall not exceed the budget of the Experimental Department. FERGUSON shall be liable for any excess thereof. However, said Experimental Department shall be permitted to accept and take in and perform outside machine work, the proceeds of which shall be deposited in said special account and to be used by said Experimental

Department. A statement of all such monies earned shall be issued to ENTER-PRISES by the said Experimental Department no later than the 10th day of the month for the month immediately preceding same. The Experimental Department shall have the right to utilize all such income in the operation of the Experimental Department. However, at the end of the fiscal or calendar year, whichever the case may be, should any taxes be required to be paid by ENTERPRISES due to said outside work, said taxes shall be paid by the said Experimental Department to ENTERPRISES for that purpose only.

d. The said Experimental Department may be terminated upon the death of FERGUSON and the provision of said paragraph shall cease and be no obligation on the part of ENTERPRISES to continue same beyond the natural life of FERGUSON and all the assets of said Experimental Department shall revert back to ENTERPRISES.

6. The rights to any and all inventions, models, drawings, plans, data and all letters patent derived or obtained by reason of the aforementioned Experimental Department shall be the sole property of ENTERPRISES for the Western Hemisphere. The setting up and continuance of said experimental department is an express consideration and requirement herein, and any defense as to the enforceability or failure to show that any damage would result to FERGUSON upon discontinuance of this department is hereby waived by the undersigned. However, FERGUSON, during his lifetime, shall have all rights to said patents in all other places in the world, excepting as heretofore stated for the Western Hemisphere. Upon his death, all of the rights given to FERGUSON by reason of this Paragraph 6 or by reason of FERGUSON being the inventor shall pass to his heirs, beneficiaries or estate. In addition to the above, ENTERPRISES shall pay to the estate of FERGUSON or to his nominee or designee the sum of $4,000.00 per year in equal weekly installments during the lifetime of LUCILLE M. FERGUSON, FERGUSON's present wife.

7a. That the stock of 444 WEST 55TH STREET CORPORATION shall be deposited in TRUST, with designated trustees to be appointed, for the faithful performance of ENTERPRISES of the terms, conditions and liabilities of this agreement and FERGUSON'S lifetime employment contract. ENTER-PRISES shall have the right to vote said stock deposited in trust hereunder so long as ENTERPRISES is not in default of any of the terms of this agreement. * * * This trust unless sooner terminated shall terminate upon the death of FERGUSON and the stock deposited hereunder shall forthwith be returned to ENTERPRISES. * * *

b. No illness or disability of FERGUSON shall be a cause for the breach of this contract nor cause same to come to an end; nor shall the length of time during which FERGUSON may remain away from his work due to illness, or any other cause, be a cause for breach of [sic] termination of this contract. FERGUSON shall be the sole judge of his requirements for absences, or for his presence, or time required for the rendering of his services and performing his duties. During any happening of the above, the compensation of FERGUSON shall not cease, but be paid regularly. ENTERPRISES specifically agrees to the above.

c. That neither ENTERPRISES or [sic] TRUSTEE of 444 WEST 55TH STREET CORPORATION shall have the power or right to sell, rent, lease, sublease, exchange mortgage or in any way dispose of the real properties of its appurtanences [sic] furniture, fixtures or equipment or machinery used with the real properties or for the repairs or automobile work, without the written consent of FERGUSON and both FERGUSON and THE UNDERSIGNED agree that the said shares of stock of 444 WEST 55TH STREET CORPORATION

18

shall be endorsed thereon to the effect that it is subject to the FERGUSON employment agreement. * * *

d. That ENTERPRISES shall have the use of the properties of 444 WEST 55TH STREET CORPORATION, so long as ENTERPRISES shall promptly pay all taxes of every nature whatsoever both of 444 WEST 55TH STREET CORPORATION and the properties, interest and mortgage installments, mortgage principal balance when due or the renewal of said mortgage with the consent of FERGUSON, as and for rental for the said properties * * *

The 1955 agreement also expressly provided that Enterprises would have the right to organize one or more wholly owned subsidiaries, provided only that any such subsidiary would be found by all the provisions of the June 29, 1955, agreement. Pursuant to this authority, Enterprises formed Fergus Imported Cars, Inc. (herein sometimes called Imported), a New York corporation, as its operating subsidiary. For convenience, hereinafter references to Enterprises, where appropriate, shall encompass its wholly owned subsidiary, Imported.

Sometime subsequent to the execution of the 1955 agreement and the organization of Enterprises and Imported, a checking account was opened with a New York bank in name of "Fergus Imported Cars, Inc., Experimental Department." In order to open that account Imported adopted and furnished an appropriate bank account resolution and Dube, who had become president of Imported, personally went to the bank to open the account. Petitioner was the sole person authorized to sign checks on this account. For the period July 1, 1955, to February 25, 1957, Imported paid into the experimental department checking account $54,642.78 and also paid $11,173.61 directly to employees of said experimental department.

After the transfer of petitioner's automobile dealership to Enterprises, provision was made by Enterprises for petitioner to take over the entire third floor of the 55th Street building (owned by 444) for operation of the so-called experimental department. A considerable amount of machinery was placed in petitioner's third-floor shop pursuant to the 1955 agreement, including lathes, milling machines, and shaping machines, as well as tools commonly used in automobile repair shops. Approximately one-quarter of the floor was used for office space and a substantial portion was used for storage of cars.

The experimental work carried on by petitioner in his spare time prior to the conveyance of his automobile dealership to Enterprises in 1955 was thereafter carried on by him in his third-floor shop known as the experimental department.[1] Petitioner has always viewed his

[1] Use of the term "experimental department" throughout our Findings of Fact herein is for convenience and consistency with the terminology used by the parties at trial and on brief. The use of such term should not be construed to imply a conclusion that the third-floor shop was in fact a "department" or branch of Enterprises or Imported. The propriety of such a conclusion is the central issue to be decided herein.

experimental work as a serious endeavor and not as a hobby. The experimental work in which petitioner was engaged during the tax year in question related to a new type of engine which he believed would be far more efficient than conventional engines, and to the use of compressed air to help run the engine, brake the car, and operate accessories. Petitioner is confident that his device will ultimately be salable, that demand will be great and that proceeds from sale of rights in the invention will run into millions. Petitioner has not applied for any patents in connection with these experiments. In addition to the experimental work carried on subsequent to the 1955 agreement, petitioner engaged the experimental department in certain profit-making transactions described hereinafter.

On the other hand, the members of the Dube group generally did not take petitioner's experiments seriously. They viewed his work as a kind of devoted tinkering by a man who in his younger days had been materially involved with the early history of automotives. They were aware that he had once developed his own automobile and that he once held several United States and British patents, but because of his advanced age at the time of the 1955 agreement and because he apparently had not secured any patents or commercially exploited any results of his part-time experimental work during the time they were associated with him (as employees of Fergus Motors), they placed virtually no value upon his experimental work. Although, under the 1955 agreement, Enterprises was to have exclusive rights in the Western Hemisphere to the exploitation of any inventions developed in the so-called experimental department, the Dube group, generally, never expected that any exploitable inventions would be developed. The entire experimental department arrangement was suggested by petitioner, and the Dube group regarded the so-called department as in substance under the control and ownership of petitioner. The required 3-percent (of gross sales) payments to be made by Enterprises to the experimental department under the 1955 agreement were regarded by the Dube group as in substance rental payments to petitioner for the use of the buildings in which Enterprises carried on its business.

Despite the fact that he received annual payments designated as salary pursuant to the terms of the 1955 agreement, petitioner did not perform any services for Enterprises during the years 1955 through 1959, inclusive, except insofar as his experimental work could be considered as benefiting Enterprises.

Between September 1956, and February 1957, several lawsuits were instituted in the Supreme Court of the State of New York relating to the 1955 agreement between petitioner and the Dube group. In

September 1956, petitioner's wife, from whom he was then judicially separated, instituted an action against petitioner, joining as defendants, *inter alia*, Enterprises, Imported, 444, and the Dube group. Her action was to set aside the June 29, 1955, agreement and the transactions pursuant thereto on the grounds that petitioner engineered same for the purpose of concealing his interest in his properties in order to defeat her claims for alimony arrearages and that he remained beneficial owner of all the property that he purportedly transferred pursuant to said agreement.

The second lawsuit was a stockholders' derivative action instituted in December 1956, by petitioner against the Dube group and Joseph Ferguson, Jr., and naming Enterprises and Imported as parties defendant. This action charged the Dube group with waste of the corporate assets of Enterprises as a result of their action in increasing salaries (including petitioner's), allegedly in violation of the 1955 agreement. The Dube group retained counsel to defend this action, and counsel recommended as a defensive measure a suit against petitioner for an accounting of the experimental department funds pursuant to the *language* of the 1955 agreement. Thus, in February 1957, Enterprises and Imported as joint plaintiffs brought suit against petitioner as manager and director of the "Experimental Department," charging him with breach of trust and dissipation of trust funds, to wit, the moneys paid by Imported into the "Experimental Department."

These three actions were adversary proceedings and were vigorously contested by all of the parties. They were tried for 5 days in a New York court. The trial judge died before rendering a decision, and a retrial was held. The Dube group was very anxious to settle the triangular litigation; they viewed themselves as having been caught in the middle of what was essentially a dispute between petitioner and his estranged wife. After the retrial the parties negotiated for another 3 weeks or so until, on May 23, 1958, a written stipulation was executed in settlement of all the lawsuits. Said stipulation of settlement was incorporated into an order and judgment of the New York court.

The relationships between petitioner, Enterprises, Imported, 444, the Dube group, and the so-called experimental department were substantially changed under the May 23, 1958, settlement agreement (hereinafter referred to as the 1958 agreement) from what they had been under the 1955 agreement. The pertinent provisions of the 1958 agreement may be summarized as follows:

1. The stock in 444 was to be released from trust and delivered free and clear to petitioner.

2. Imported was to lease from 444, for a 5-year term commencing July 1, 1958, the main floor and basement at 1717 Broadway and the entire building (except the third floor) at 444 West 55th Street.

3. The 7,500 shares of Enterprises class B nonvoting stock under the control of petitioner were to be surrendered back to the company.[2] The 10 shares of class A voting stock held by Joseph Ferguson, Jr., were to be surrendered to the company for $1,250.

4. The 1955 agreement was expressly canceled.

5. The employment agreements entered into with petitioner and Joseph Ferguson, Jr., pursuant to the 1955 agreement were canceled. A new arrangement provided that petitioner would receive from Imported $5,200 per year for life as a consultant.

6. The rights and obligations as between petitioner and his wife were settled in a separate agreement executed contemporaneously with the instant one.

7. In the event that Imported should vacate the two buildings of 444 which it occupied, it would forfeit its right to use the name "Fergus."

8. Petitioner agreed to hold harmless, Imported, Enterprises, and the Dube group from any Federal income tax claims which might arise against them based upon "transactions entered into, business done and income derived by" Fergus Motors and/or petitioner subsequent to the date of the 1955 agreement.

9. The "experimental fund" was to be continued under the sole management and direction of petitioner, all parties acknowledging that the terms of the 1955 agreement with respect to said fund had properly been complied with by both Enterprises (and Imported) and petitioner. Future expenditures from the experimental fund, as in the past were to be on the sole signature of petitioner "in such amounts and for such purposes as in his judgment may be necessary to further the purpose of experimentation."

10. Payments by Imported into the experimental fund were to be according to the following schedule:

| FYE June 30— | Percentage of "Gross Income" as defined |
|---|---|
| 1959 | 3 |
| 1960 | 2½ |
| 1961 | 2 |
| 1962 | 1½ |
| 1963 | 1 |

Each applicable percentage was to be reduced by ½ percent in the event of petitioner's death prior to June 30, 1963. A minimum annual payment of $75,000 (at $6,250 per month) was provided; i.e., in no

---

[2] Of these 7,500 shares, 150 were held by two individuals who were apparently holding under petitioner's control. Enterprises was to pay $6,250 for these 150 shares. The difference between the 7,500 shares redeemed under the 1958 agreement and the 8,000 shares issued to petitioner under the 1955 agreement is not explained in the record.

year could the payments arrived at by the percentage formula be less than $75,000. Said $75,000 was to be "deemed received by and in payment and satisfaction of the rents required to be paid under and pursuant to the aforementioned agreements of lease." (Par. 2 above.) In the event of sale of either of the buildings to be leased or of the stock of 444, then Imported's obligation to the experimental fund as provided above would be reduced by the amount of rent paid to the new owner.

11. The experimental fund was to be discontinued after June 30, 1963, the end of the 5-year term during which 444 was to lease the two buildings to Imported.

12. Petitioner, "as manager and director of the Experimental Fund and bank account" was to make available all books and records of the experimental fund "required for tax purposes by Imported."

13. Petitioner was in no event permitted to use experimental fund money to compete with the businesses of Enterprises or Imported.

14. Petitioner and 444 agreed to hold Enterprises and Imported harmless from any liabilities or obligations arising from the operation of the experimental fund.

The following highly pertinent paragraphs are quoted verbatim from the 1958 agreement:

H. Whenever the Experimental Fund is terminated, whether by lapse of time or by direction of Joseph B. Ferguson, Sr., or his heirs, executors or administrators, as the case may be, all existing assets of the Experimental Fund or future assets acquired through the use of Experimental Fund monies shall be immediately and forthwith transferred to Joseph B. Ferguson, Sr. and/or his heirs, executors or administrators, as the case may be. Notwithstanding, in such case, Imported shall continue to own and receive 20% of the proceeds of any and all patent rights developed by said Experimental Fund for the period of five years in the State of New York.

*    *    *    *    *    *    *

J. Federal or state income taxes, if any, which may be due or owing with respect to moneys heretofore paid, or which may hereafter be paid into the Experimental Fund, shall be the debts and obligations of Imported and/or Enterprises, and not of Joseph B. Ferguson, Sr., or the said Experimental Fund, provided, however, that regardless of whether in any one year the percentage amounts provided for in paragraph 13B shall yield $75,000 or more or less, than 1) the amount of $75,000 therein contained shall be deemed and regarded by the parties, and is, an item of expense of Imported and/or Enterprises, to wit, the rent provided to be paid under the said agreements of lease for that period of time, and 2) the liability of Imported and/or Enterprises for federal and state income taxes, based on the excess paid into the Experimental Fund over the $75,000 aforementioned, shall not exceed 65% of the taxes based upon such excess, and Joseph B. Ferguson, Sr. agrees to indemnify, save and hold harmless Imported and/or Enterprises from tax liability as to the remaining 35% based on such excess.

The unusual nature of the 1958 settlement agreement resulted from a negotiated compromise designed to satisfy a diversity of interests. Petitioner's wife insisted that the valuable real estate be returned to petitioner's ownership and control and that it be leased to Enterprises and Imported for fixed specified rent which she could look to for satisfaction of her alimony claims. Petitioner, on the other hand, wanted to retain the form of the 1955 agreement under which 3 percent of Imported's sales was paid into the so-called experimental department. The Dube group was willing to pay $75,000 to $85,000 a year for rental of the space which Imported occupied in the buildings at 444 West 55th and 1717 Broadway, and they estimated that 3 percent of their sales for the first year under the new agreement would approximate that amount. However, they anticipated annual increases in sales, and thus were unwilling to accept a lease arrangement based upon a fixed percent of sales. Both the petitioner's wife and the trial court judge, who participated in the settlement negotiations, insisted for the wife's protection that the payments by Imported for occupancy of the buildings be clearly labeled as rent. The net result, as detailed above, was an agreement providing for annual payments by Imported of at least $75,000 labeled as rent, and further providing for payments into the experimental fund of a percentage of annual sales, to the extent such percentage exceeded $75,000. The percentage was to decline by one-half percent each year to allow for expected annual increases in sales and thereby maintain the result of the percentage computation at approximately $75,000.

In 1959, there occurred a boom in the imported car business, and as a result, a substantial increase in sales was experienced by Imported. This meant that the percentage payments required to be made by Imported under the 1958 agreement came to far more than the approximately $75,000 anticipated by the Dube group. Such payments totaled $132,592.57, and they were made as follows: Twelve monthly checks for $6,250 were drawn and delivered to 444. These checks were labeled "rent" and together totaled $75,000. They were all deposited in a checking account maintained in a New York bank in the name of 444 West 55th Street Corp. An additional $57,592.57 was paid by checks made payable to "Fergus Imported Cars, Inc. – Experimental Department," which checks were deposited in a checking account bearing that same designation. Both of the above-mentioned checking accounts were maintained in the same New York bank, and petitioner was the only person authorized to sign checks on either account.

Also, during 1959, a savings account in the name of "Joseph B. Ferguson (Fergus Experimental)" was maintained in the West Side Federal Savings & Loan Association. Petitioner was the only person

authorized to sign withdrawal slips to withdraw funds from that account. During 1959, interest income aggregating $1,185 was credited to this account, none of which was reported by petitioner in his personal tax return.

The $75,000 paid by Imported to 444 in 1959 specifically as rent was considered by petitioner to be experimental department property, and it was expended by him for what he considered experimental fund purposes, including loans to and investments in various automobile dealerships and other ventures with third parties. Petitioner's wholly owned corporation, 444, in its Federal income tax return for 1959 made the same claim; it excluded the $75,000 from income with the explanation that the receipts "are applied to Experimental Department of Fergus Imported Cars, Inc."

During 1959, as he had done since 1955, petitioner carried on his experimental activities in his third-floor shop at 444 West 55th Street. In addition to his experimental work petitioner bought, sold, and repaired used cars, primarily foreign models. Occasionally, he would purchase a car with unusual characteristics, use it in his experimental work, and then sell it, frequently at a net profit. He advertised cars for sale or rent in the newspaper. A considerable portion of his total space on the third floor was used for storage of automobiles. Petitioner had several employees. These men, when they were not engaged in experimental work, performed automobile repairs.

The so-called experimental department did not file any income tax returns. Petitioner never reported the results of the investment or business activities of the experimental department to Imported or the Dube group, and neither the Dube group nor Imported ever requested an accounting from petitioner under the 1958 agreement. Petitioner maintained practically no books and records related to experimental department activities and the few that were kept were totally inadequate for purposes of disclosing taxable income.

Petitioner's personal income tax return for 1959 reported as the sole income item a salary of $7,280. Although the return listed Imported as his employer, said "salary" was not paid to petitioner by Imported, but rather, petitioner paid it to himself out of the experimental department bank account.

444 did not report in its 1959 return the $75,000 paid to it by Imported pursuant to the 1959 agreement and lease, nor did it report the $57,592.57 paid by Imported directly to the so-called experimental department. Neither did it report interest income of $1,654.35 credited to its savings account at the West Side Savings & Loan Association during 1959. On the other hand, depreciation totaling $8,380 relating to the two buildings leased to Imported was included in expenses deducted in the same return.

On December 19, 1963, a notice of deficiency was mailed to 444 asserting a deficiency for 1959 in the amount of $35,529.21, the principal adjustment therein being a determination that 444 understated its 1959 rental income by $75,000. On June 12, 1964, a second notice of deficiency was issued to 444 for the year 1959, increasing the unreported rental income from $75,000 to $132,592.57.

Imported and Enterprises were liquidated sometime shortly after April 30, 1962. On May 3, 1962, Imported and the Dube group, as parties of the first part, entered into an agreement with 444, petitioner and "the Experimental Division of Fergus Imported Cars, Inc.," as parties of the second part, wherein the business of Imported was sold to petitioner, and the parties released each other from all obligations under the 1958 agreement. The "Experimental Division," however, was to, and did, continue in existence as in the past, and at the time of trial it was being operated by petitioner under a percentage-of-sales arrangement similar to that in effect during 1959, but with a new corporation organized by petitioner's son and others.

ULTIMATE FINDINGS OF FACT

The so-called experimental department was at all times relevant the personal property of petitioner.

During the year 1959, 444 West 55th Street Corp. was on the cash method of accounting.

OPINION

In the course of preparing for their defense in this Court of a deficiency of less than $1,200 resulting from disallowance of an alimony deduction, respondent's attorneys found themselves swept along on a voyage of discovery which in its own way came to rival Carter's exploration of the tomb of Tutankhamen; the wonders and tax treasures ultimately unearthed from beneath an unobtrusive surface were so great that respondent has now conceded the original alimony adjustment which prompted his voyage and has amended his pleadings to allege new deficiences totaling in excess of $300,000. Petitioner, whose tax return showed a modest salary as his only income, was discovered to have had control of three parcels of valuable real estate and to have been enmeshed in a complicated series of transactions involving, *inter alia*, payments during 1959 of $132,592.57 to a mysterious "experimental department." And the taxable income represented by these payments, like the Fergus automobile, appears to have vanished from the American scene.

The basic facts here are not in dispute. In 1959 Imported paid $75,000 to 444 and $57,592.57 to the experimental department; the $75,000 was expended by 444 for the benefit and purposes of the ex-

perimental department. The question thus boils down to, who, if anyone, owned the experimental department?

We have set forth at some length the factual background of the experimental department. The facts of record, particularly the very terms of the 1958 agreement, make it abundantly clear that the so-called experimental department was but a flimsy screen behind which petitioner sought shield from income which was so undeniably his that it is a mystery to us how he could expect anyone to believe it was not. True, the 1955 agreement had some provisions which might tend to make it appear as if Imported (or Enterprises) was the owner of the experimental department. It is on these few provisions (particularly the right of Imported to exploit patents developed by the experimental department and the clause stating that payments to the experimental department were to be used for experimental purposes) that the petitioner is forced to base his entire case despite the fact that the overall effect of the 1955 agreement taken as a whole and the testimony of record herein make it apparent that such provisions were but the loose-woven threads in a sheer curtain of window dressing.

The futility of petitioner's case is heightened by his being forced to rely on the window-dressing clauses of the 1955 agreement as carrying over and applying in substance in the tax year 1959, after the 1958 agreement had eliminated virtually all of the ambiguity about the experimental department by cutting such window dressing to the bare bone, largely because of the adversary interest of petitioner's wife, who insisted on calling rent "rent."

The very terms of the 1958 agreement point unmistakably to our ultimate finding that the experimental department was owned by petitioner and was not a department or division of Enterprises or Imported. Petitioner had complete control and discretion over the use of experimental department funds. He was empowered to terminate the experimental department at will and receive all of its assets directly, and upon his death during the existence of the department, all of its assets were to go to his estate. Both the 1955 and the 1958 agreements provided that petitioner would ultimately bear the responsibility for income tax deficiences payable by Enterprises as a result of the experimental department's being regarded as the property of Enterprises. Petitioner further agreed to hold Enterprises harmless from any other liabilities or obligations arising from the operation of the experimental department.

Additional evidence, outside of the 1958 agreement itself, that the experimental department could not have been a division of Enterprises may be found in the May 3, 1962, contract in which the 1958 agreement was canceled. In this contract, in which Enterprises was a "party of the first part," the experimental department itself was

joined with petitioner *as a party* of the second part. Thus, Enterprises and the experimental department were both parties and on opposite sides of the transaction. Furthermore, the experimental department survived the existence of Enterprises.

Petitioner emphasizes the fact that Enterprises was to receive rights to patents to be developed in the experimental department. Petitioner testified at length concerning his early inventions in the automotive field in an effort to establish that his experimental work could ultimately be expected to produce exploitable inventions, and we have set forth extensive biographical findings of fact concerning petitioner's early background. Though it may be true that petitioner regarded his experimental work as a serious profit-motivated endeavor and not as a mere hobby, the testimony of the Dube group makes it quite plain that petitioner's work had no value to them. The rights to exploitation of patents to be developed by the experimental department which were granted to Enterprises under the 1955 agreement were mere verbal cellophane. This is made clear by the fact that Enterprises' rights under the 1955 agreement to 100 percent of patent proceeds in the entire Western Hemisphere were reduced under the 1958 agreement to but 20 percent of proceeds derived in the State of New York for a period of 5 years.

Petitioner also relies heavily on the fact that the Dube group instituted a lawsuit against him, as part of the tripartite 1958 litigation, in which the experimental department was alleged to have been owned by Enterprises and petitioner was charged as a trustee of its assets. This fact, however, is but a slender reed. It is clear from the circumstances of the 1958 litigation and the testimony of record herein that the contentions made in that lawsuit were necessitated as a defensive action arising out of the lawsuits by petitioner and his wife against the Dube group and their companies.

Our finding that petitioner owned the experimental department does not conclude the instant case. Respondent has attributed as income to petitioner the total $132,592.57 of payments made by Imported in 1959 pursuant to the 1958 agreement. Of this total $75,000 was paid by check directly to 444, petitioner's wholly owned corporation. The balance of $57,592.57 was paid by check made out to and deposited in the account of the experimental department. Petitioner argues that constructively, and in substance, the entire $132,592.57 was paid to the experimental department (which, of course, he alleges was not his property). Respondent contends that constructively, and in substance, the entire $132,592.57 was paid to and was income of 444, and since the entire amount was expended by petitioner (who owned all the stock of 444) for experimental department purposes, such amount was a constructive dividend from 444 to petitioner.

Were it not for a controversy about 444's earnings and profits balance in 1959, the case would be concluded with a holding that the entire $132,592.57 was income to petitioner (through the experimental department), whether it is regarded as having been paid to him directly or whether all or any part is regarded as having come to him as a constructive dividend from 444. In either event the entire amount would be ordinary income to him. However, a constructive dividend can be constructed only out of available earnings and profits, and petitioner contends that 444 had a deficit in earnings and profits in 1959 (at least prior to inclusion therein of any income resulting to 444 from the payments by Imported). If 444 did have an earnings and profits deficit, as petitioner contends, the total income taxable to petitioner as a result of the $132,592.57 total payments made by Imported has to be less than that amount if any portion of these total payments is deemed to have been made to 444. Hence, we must determine whether any of the payments by Imported were income to 444, and if so, the correct balance of 444's earnings and profits.

We are of the opinion that 444 was a tax-cognizable entity which carried on a business and had a corporate personality of its own, and that it was not a mere shell or conduit which should be ignored for tax purposes. *Moline Properties, Inc.* v. *Commissioner*, 319 U.S. 436 (1943). The 1958 agreement expressly provided that 444 was to lease space in two of its buildings to Imported. Such a lease was subsequently executed in writing, and in 1959 Imported paid a total of $75,000 by check to 444 pursuant to such lease. Even the 1958 agreement, with all its man-made smog hanging over the provisions regarding the percentage-of-sales payments to the experimental department, makes reasonably clear that at least $75,000 is to be paid annually as rent for use of 444's buildings. We know from the testimony herein that petitioner's wife insisted that at least this much be made clear for her protection. 444 held title to the buildings leased to Imported. Imported made rent payments totaling $75,000 directly to 444 and the checks were deposited in an account in 444's name. 444 was a legal and taxable entity separate and distinct from petitioner, and even though the rent money paid to 444 was used by and for petitioner's experimental department, nonetheless, these payments were first the property and income of 444. *Moline Properties, Inc., supra.* The fact that 444 saw fit to use the money for the benefit of the petitioner (through the experimental department) cannot change the fact that it constituted rental income when received. *Palm Beach Aero Corporation,* 17 T.C. 1169, 1178 (1952).

Having held that at least $75,000 of the total payments made by Imported in 1959 was income to 444, and having earlier found that this entire $75,000 was expended by petitioner for the benefit of his experi-

mental department, we must now consider the correct amount of 444's earnings and profits account in order to determine how much of the $75,000 expended for petitioner's benefit can be taxed to him as a constructive dividend.

In its 1959 corporate income tax return 444 showed an earned surplus deficit of $9,985.62 as of the beginning of 1959 and a deficit of $17,738.45 as of the end of 1959. It reported a net loss of $7,752.83 for the year. It has been stipulated that for purposes of determining 444's earnings and profits for 1959, the amount allowable to 444 as a deduction for depreciation is $7,412 instead of the $11,630 claimed on that return. Therefore, for this purpose, 444 has an adjusted reported loss of $3,534.83 for 1959.

Respondent contends that 444 had at least $27,514.38 of accumulated earnings and profits as of the end of 1958, rather than the deficit of $9,985.62 reported. It is argued that if we find that the payments by Imported to 444 constituted rent income to 444 during 1959, consistency requires, at least for purposes of determining earnings and profits, that payments which the record indicates were made under the same agreement in the same manner during 1958 must be given the same treatment. Thus, respondent would have us increase 444's earnings and profits account by at least $37,500, the amount presumably paid by Imported to 444 during 1958 but which was not included in income by 444. We reject this contention. The 1958 rent payments by Imported to 444 were, presumably and apparently, expended in the same manner for the benefit of petitioner's experimental department in 1958 as they were in 1959. At least respondent, upon whom rests the burden of proof in this case, has not shown that they were not. Such expenditures in 1958 would be constructive dividend distributions that year which would *reduce* corporate earnings and profits. Thus, consistency also requires a second adjustment reducing 1958 earnings and profits by the same amount respondent would have us increase it, the net result being no change in the net deficit as of December 31, 1958, as reported by 444.

There being a deficit in accumulated earnings and profits as of the beginning of 1959, petitioner could be charged with a constructive dividend only to the extent of earnings and profits of the taxable year 1959. Sec. 316 (a) (2), I.R.C. 1954. A net loss (adjusted for the stipulated change in allowable depreciation) for 1959 of $3,534.83 was reported by 444. This net loss was calculated without including in gross income the $75,000 payments received from Imported, which payments we have previously held were rent income to 444. The calculation also fails to include $1,654.35 of unreported interest income credited in 1959 to 444's savings account at the West Side Savings

Bank. Both of these amounts must be added to 444's gross income, thus producing a net profit and current earnings and profits for 1959.

Petitioner contends that a further adjustment is required, *reducing* earnings and profits, if the above-described adjustments are to be made. Specifically, he argues that 1959 current year's earnings and profits must be reduced by the amount of corporate income tax which would be payable by 444 on its taxable net income as determined herein after incremental adjustments. Respondent resists this contention, arguing that 444 was a cash basis taxpayer in 1959, that it made no cash income tax payments that year, and that cash basis taxpayers may not reduce current year's earnings and profits by income taxes which are paid in a subsequent year (or years). Petitioner retorts with the alternative allegations that 444 was on the accrual basis in 1959 and that even if it had been on the cash basis, as respondent asserts, its 1959 earnings and profits should still be reduced by 1959 Federal income tax.

Although the evidence is not abundant, the record sufficiently establishes that 444 was on the cash basis, as respondent alleges. Particularly significant is the following excerpt from the stipulation of facts herein:

With respect to the $47,607.28 of rental income described in paragraph 7(b) [of the stipulation of facts] and the deduction of $43,730.11 described in paragraph 7(c), [of the stipulation] being the only items (other than depreciation deduction) set forth in [444's 1959] tax return, the return was prepared by the inclusion in income of items in the year of receipt and by the claiming of deductions in the year of payment. Petitioner does not concede that the preparation of the return on an accrual basis would have resulted in the inclusion and deduction of different amounts. The 1953 income tax return, Form 1120, of 444 West 55th Street Corp. as to question 9, page 3, of that return, stated that the return was prepared on the accrual basis. * * *

The 1959 corporate income tax return of 444 was stipulated into evidence as a joint exhibit. In Schedule L on page 4 of said tax return are set forth the balance sheets of 444 as of the beginning and as of the end of 1959. No accrued assets or accrued liabilities are shown on either of these balance sheets. The same 1959 tax return shows deductions claimed for such expenses as insurance, taxes, interest, and license, and shows income from rents. Items of income and expense such as these normally involve some degree of yearend accrual by an accrual basis taxpayer. Here none of these items appeared as accruals (or deferrals) in 444's balance sheets for either the beginning or the end of 1959. It is so highly unlikely that a taxpayer having expense items such as these would be able to end up with properly prepared accrual basis balance sheets for 2 successive years which did not contain a single accrual item that such balance sheets must be regarded as persuasive evidence that 444 was not on the accrual basis, but rather on the cash basis.

The fact that 444 stated in its 1953 return that that return was prepared on the accrual basis is not persuasive as to the reporting method employed in 1959. Respondent is not obliged to show that 444 obtained his permission to change accounting methods (see sec. 446(e), I.R.C. 1954), in order to establish that 444 in fact made such a change. If such a change was instituted between 1953 and 1959 without respondent's permission, petitioner cannot now be heard to demand that such change be ignored and that respondent be *required* to treat 444 as remaining on the accrual method. We have found as an ultimate fact that 444 was on the cash basis in 1959 and we so hold.

This holding brings us face-to-face with one of the classic unresolved problems in the area of earnings and profits: Are current year's earnings and profits of a cash basis corporation reduced by Federal income tax on current year's income although such tax is not paid until the following year (or years)? The regulations under section 312, I.R.C. 1954, provide (in sec. 1.312–6):

(a) In determining the amount of earnings and profits (whether of the taxable year, or accumulated since February 28, 1913, or accumulated before March 1, 1913) due consideration must be given to the facts, and, while mere bookkeeping entries increasing or decreasing surplus will not be conclusive, the amount of the earnings and profits in any case will be dependent upon the method of accounting properly employed in computing taxable income (or net income, as the case may be). For instance, a corporation keeping its books and filing its income tax returns under subchapter E, chapter 1 of the Code, on the cash receipts and disbursements basis may not use the accrual basis in determining earnings and profits; * * *

Despite the unambiguous language of this regulation, the courts have had considerable difficulty coping with the effect of Federal income taxes on the earnings and profits of a cash basis corporation.[3] Leading text writers have noted the split of authority which exists in the cases today. Bittker, Federal Income Taxation of Corporations and Shareholders 145, fn. 9; Surrey and Warren, Federal Income Taxation 1238 (1960). This Court has played an integral role in the turbulent history of this problem, a history which must be reviewed and understood in order to adequately analyze and decide the issue in this particular case.

This question was first decided in *Hadden* v. *Commissioner*, 49 F. 2d 709 (C.A. 2, 1931), in which it was held that earnings and profits of a cash basis corporation *are* reduced by income tax on current year's income. Our first encounter with the problem arose in *M. H. Alworth Trust*, 46 B.T.A. 1045 (1942), revd. 136 F. 2d 812 (C.A. 8, 1943), certiorari denied 320 U.S. 784, in which we held that earnings and profits

---

[3] Although no one ever seems to have questioned the regulation insofar as it prohibits the reduction of earnings and profits of a cash basis corporation by accrued expenses *other than Federal income taxes* (and penalties related thereto).

*are* reduced. We relied on the *Hadden* case but did not discuss it. Our decision was based upon corporate law and accounting concepts of dividends and impairment of capital. We reasoned that earnings and profits must take into account "outstanding liabilities" or else a distribution would leave such liabilities "as a charge on capital, regardless of the method by which the corporation keeps its books and to the extent thereof the distribution would impair capital and would not be a dividend." (46 B.T.A. at 1048.) The language used was broad enough to cover all accrued liabilities—not just income taxes.

The decision in *Alworth* was reviewed by the Eighth Circuit, *Helvering* v. *Alworth Trust*, 136 F. 2d 812 (C.A. 8, 1943), which rejected our reliance on corporate and accounting principles. The Court of Appeals pointed out that the *Hadden* case suffered from a marked lack of reasoning to support its result and that the tax rules prescribed by the internal revenue laws regarding dividends do not necessarily conform to standard corporate law concepts; that a distribution may be taxable as a dividend under the tax law even though the corporation making the distribution may have been barred by local corporate statutes (by reason of capital impairment, etc.) from distributing earnings. It was held that it would be an unwarranted extension of the tax statute to require that earnings and profits must be reduced by Federal taxes for the current year of a cash basis corporation.

This Court has followed the rule of the Eighth Circuit in *Alworth* in subsequent cases in which we have considered the issue. *Paulina du-Pont Dean*, 9 T.C. 256 (1947), acq. 1947–2 C.B. 2, *appeal dismissed nolle prosequi* (C.A. 3, 1949); *United Mercantile Agencies, Inc.*, 23 T.C. 1105 (1955).[4] Our opinion in *United Mercantile Agencies, Inc., supra*, was reversed by the Sixth Circuit sub. nom. *Drybrough* v. *Commissioner*, 238 F. 2d 735 (C.A. 6, 1956), and the *Drybrough* case has become established as the leading case taking what is generally regarded as the polar position to *Alworth*. The reversal of our opinion in *United Mercantile* by *Drybrough* has been followed in *Thompson* v. *United States*, 214 F. Supp. 97 (N.D. Ohio 1962); and *Demmon* v. *United States*, 321 F. 2d 203 (C.A. 7, 1963).[5]

There can be no quarrel with the fact that current year's earnings and profits are not necessarily synonymous with current year's taxable income. For example, interest received on tax-exempt bonds is not included in taxable income, yet must be included in earnings and profits,

---

[4] See also *Newark Amusement Corporation*, T.C. Memo. 1960–137, in which we relied on the regulations, followed *Alworth* and distinguished *Drybrough*, observing that *Drybrough* did not specifically disagree with *Alworth*. *Estate of John H. Wheeler*, 1 T.C. 640 (1943), reversed without discussion of this point 143 F. 2d 162 (C.A. 9, 1944), revd. 324 U.S. 542 (1945), in which we followed our own original decision in *Alworth*, was decided before our holding in *Alworth* was reversed by the Eighth Circuit.

[5] The *Demmon* case is discussed in 19 J. Taxation 263 (1963). See also "Tax Consequences of Shareholder Diversions in Close Corporations," 21 Tax L. Rev. 223 (1966), for a general discussion of the issue and all of the cases.

sec. 1.312–6 (b), Income Tax Regs; the reduction of earnings and profits for depletion is limited to depletion computed on the cost method even though the deduction from taxable income may be based on the more liberal percentage method. *Ibid.* sec. 1.312–6 (c) (1). This absence of synonymity between earnings and profits and taxable income has been emphasized by the cases which adhere to the *Drybrough* view. Thus, one of the principal arguments raised has been: Since earnings and profits are determined for another purpose and are not necessarily the same as taxable income, there is no good reason why a strict cash basis must be be adhered to for earnings and profits purposes even though the cash basis is used in accounting for taxable income.

This position is correct only in that there is no statute or inescapable rule of logic which *requires* strict adherence to the cash basis for earnings and profits purposes. However, there *is* a long-standing regulation which establishes such a requirement, sec. 1.312–6 (a), Income Tax Regs., such a regulation has a sound basis in administrative policy and there are no persuasive reasons why any departure from the cash basis used for reporting income *should be* permitted for purposes of computing earnings and profits and why the Commissioner's regulations should be ignored.

The rationale which appears to underlie *Drybrough* and its progeny is traceable all the way back to the Board of Tax Appeal's opinion in *Alworth*, which was subsequently reversed in the Eighth Circuit. On page 739 of 238 F. 2d, the court in *Drybrough* expressly states that it is persuaded by the reasoning of the Board in *Alworth*. After being reversed in *Alworth*, this Court has consistently followed the reversal, and we see no reason why we should not adhere to the same view here. The quoted regulations have been in existence for many years and should be upheld.

We hold that the current earnings and profits of 444, a cash basis taxpayer, for the year 1959 are not to be reduced by any unpaid 1959 Federal income tax liability of 444. *Helvering* v. *Alworth Trust, supra; Paulina duPont Dean, supra.* Sec. 1.312–6 (a), Income Tax Regs. Hence, the petitioner is chargeable with constructive dividend income in the amount of $73,119.52 resulting from the expenditure by 444 of its $75,000 rent income from Imported for the benefit of petitioner's experimental department.

Likewise, the other $57,592.57 paid during 1959 by Imported under the 1958 agreement was rent income to 444 and a constructive dividend to petitioner because it was made for the use and occupancy of 444's building. Since we have held that the experimental department was owned by petitioner, the entire $57,592.57 paid to it is also income to petitioner. We agree with respondent that the payments were in

34

substance rent income to 444; 444's earnings and profits would be increased by the amount thereof, thus supporting constructive dividend treatment in same amount within the limitations of section 316(a)(2), Internal Revenue Code of 1954. Accordingly, we hold that petitioner realized unreported taxable income from constructive dividends in the total amount of $130,712.09 in 1959 as a result of the payments by Imported under the terms of the 1958 agreement.

One further matter remains to be dealt with. It has been stipulated that during 1959 interest in the amount of $1,185 was earned by and credited to a savings account in the name of "Joseph B. Ferguson (Fergus Experimental)" at the West Side Federal Savings & Loan Association. It has also been stipulated that petitioner was the sole person authorized to sign withdrawal slips to withdraw funds from said account. Since we have held that the experimental department was the personal property of petitioner it follows that the interest income earned by petitioner's experimental department savings account is the petitioner's income.

In an amendment to the pleadings herein petitioner made the alternative allegation that if he is chargeable with any gross income by reason of payments made by Imported to the experimental department then he is entitled to offsetting deductions for ordinary and necessary expenses in connection with a trade or business. As to this allegation petitioner bears the burden of proof, and he has wholly failed to establish that he is entitled to any such deductions.

*Decision will be entered under Rule 50.*