WILLIAM C. WEBB, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6449–73.   Filed March 25, 1977.

*Robert A. Shupack* and *Eugene M. Short, Jr.,* for the petitioner.

*Joel Gerber,* for the respondent.

---

[4] Respondent merely states on brief that the trust payments are taxable in the year paid under sec. 83.

## OPINION

SIMPSON, *Judge:* The Commissioner determined the following deficiencies in the petitioner's Federal income taxes:

| Year | Deficiency |
|------|------------|
| 1968 | $111,129.99 |
| 1969 | 80,400.46 |
| 1970 | 201,071.07 |

The petitioner claims an overpayment of taxes for 1968 in the amount of $61,595.43.

Numerous issues have been settled by the parties; only two remain for our consideration: (1) Whether a redemption of preferred stock at less than its issuance price has any effect on the earnings and profits of the redeeming corporation; and (2) whether Federal income taxes reduce the earnings and profits of a cash method corporation in the year such taxes accrue or in the year of their payment.

All of the facts have been stipulated, and those facts are so found.

The petitioner, William C. Webb, resided in Miami, Fla., when he filed his petition herein. For the year 1968, the petitioner filed his Federal income tax return with the Internal Revenue Service Center, Chamblee, Ga. For the years 1969 and 1970, he filed his returns with the District Director of Internal Revenue, Jacksonville, Fla.

Continental Equities, Inc. (Continental), is a Florida corporation, which was incorporated on August 25, 1959. Since its incorporation, it used the cash method of accounting for Federal tax purposes. Continental issued two classes of stock: 100 shares of $1 par common and 8,500 shares of $1 par preferred. The issuance price of the 100 shares of common stock outstanding was $500, which was paid in September 1959 by Wirt Peters-Tom Maxey, a partnership. However, from September 1959 to June 10, 1968, the ownership of such shares was reflected on stock certificates as follows:

| Name | Number of shares |
|------|------------------|
| Wirt Peters | 40 |
| Gloria Peters | 40 |
| Tom Maxey | 20 |

From June 11, 1968, to August 15, 1968, the common stock of Continental was held as follows:

| Name | Number of shares |
|---|---|
| William C. Webb | 50 |
| Wirt Peters-Tom Maxey partnership | 50 |

From August 15, 1968, to the date of the trial in this case, Tom Maxey and the petitioner each owned 50 percent of Continental's common stock.

The preferred stock was nonvoting; preferred as to assets upon final liquidation; preferred as to 4-percent dividends, but noncumulative; and callable at the election of the board of directors at book value, but not less than the price received by the corporation upon original issue plus interest of 4 percent. The Hanover Bank, as trustee of the Sheldon I. Rainforth Trust (Rainforth Trust), purchased from Continental 8,500 shares of its preferred stock during September 1959 for $1,062,500, or $125 per share. During 1959, the Hanover Bank brought suit against the incorporators and officers of Continental·alleging a fraud upon the Rainforth Trust. Continental's officers advised the bank that they would bring suit for damage to their reputation. In December 1959, such dispute was settled by the payment of $400,000 to the Rainforth Trust, and the waiver of the claims by Continental's officers and incorporators against the Hanover Bank, in exchange for the 8,500 shares of Continental's preferred stock, which were then held by the Wirt Peters-Tom Maxey partnership. The partnership reported a total basis of $500 for such shares and the 100 shares of common stock for which it had previously paid that amount. On June 11, 1968, the petitioner acquired from the partnership 4,250 shares of the preferred stock.

Wirt Peters died during 1967, and his wife, Gloria Peters, was named as the administratrix of his estate. On August 15, 1968, Mrs. Peters, as administratrix of the estate of Wirt Peters, received from the partnership 4,250 shares of preferred stock pursuant to an agreement terminating and liquidating the partnership. On the same date, Continental redeemed such shares from Mrs. Peters and, in exchange, gave her a promissory note for $400,000. The price per share

was approximately $94. The parties have stipulated that such redemption qualified as an exchange under section 302(a) of the Internal Revenue Code of 1954.[1] Continental then issued such shares to itself and deposited them with an escrow agent to hold as security for Continental's obligation to Mrs. Peters.

The capital accounts of Continental from its formation until the redemption of the Peters' stock appeared as follows:

| Capital stock: | | |
|---|---|---|
| Common | $100 | |
| Paid-in surplus—common | 400 | $500 |
| Preferred | 8,500 | |
| Paid-in surplus—preferred | 1,054,000 | 1,062,500 |
| | | 1,063,000 |

The capital accounts of Continental, as reflected on its books and records after the redemption of the Peters' stock, appeared as follows:

| Capital stock: | | |
|---|---|---|
| Common | $100 | |
| Paid-in surplus—common | 400 | $500 |
| Preferred—Treasury stock | 4,250 | |
| Paid-in surplus | [1]1,058,250 | 1,062,500 |
| | | 1,063,000 |
| Treasury stock—Mrs. Peters | | (400,000) |
| | | 663,000 |

[1] The petitioner donated, without receiving any consideration, 4,250 shares of preferred stock for cancellation on Aug. 15, 1968; consequently, their par value was transferred to Continental's preferred surplus.

The following table sets forth Continental's accumulated earnings and profits for its taxable years ending in 1967 through 1970 and the amount of accrued but unpaid taxes during each of such years. The amounts of accumulated earnings and profits do not take into consideration constructive distributions the parties have agreed the petitioner received or the amounts of accrued but unpaid taxes; nor has any allowance been made as a result of the redemption of the Peters' preferred stock. The amounts of accrued taxes do not include any additional tax deficiencies which may be deter-

[1] All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

mined for such years as a result of Continental's income tax case now pending before the Fifth Circuit.

| FYE Aug. 31— | Earnings and profits | Taxes accrued |
|---|---|---|
| 1967 | $171,538.76 | $17,970.76 |
| 1968 | 243,389.00 | 18,882.24 |
| 1969 | 288,484.29 | 3,714.09 |
| 1970 | 390,258.08 | 26,268.38 |

In his notice of deficiency, the Commissioner determined that the petitioner had received constructive dividends during the years 1968 through 1970. The parties have now agreed that the petitioner did receive constructive distributions in 1968 in the amount of $24,210, in 1969 of $200,450.06, and in 1970 of $91,800. The only issues remaining for decision deal with the computation of Continental's accumulated earnings and profits so that the taxability of such distributions may be determined.

The first issue for decision is what effect, if any, will a redemption of preferred stock at less than its issuance price have on the earnings and profits of the redeeming corporation. In general, distributions by a corporation to its shareholders are considered under section 312(a)[2] to come from the earnings and profits of the corporation. However, when there is a distribution in redemption of stock which qualifies as an exchange under section 302(a),[3] section 312(e) provides:

(e) SPECIAL RULE FOR PARTIAL LIQUIDATIONS AND CERTAIN REDEMPTIONS.—In the case of amounts distributed in partial liquidation (whether before, on, or after June 22, 1954) or in a redemption to which section 302(a)

---

[2] (a) GENERAL RULE.—Except as otherwise provided in this section, on the distribution of property by a corporation with respect to its stock, the earnings and profits of the corporation (to the extent thereof) shall be decreased by the sum of—

(1) the amount of money,

(2) the principal amount of the obligations of such corporation, and

(3) the adjusted basis of the other property,

so distributed.

[3] (a) GENERAL RULE.—If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.

or 303 applies, the part of such distribution which is properly chargeable to capital account shall not be treated as a distribution of earnings and profits.

Such rule has been settled for many years, but there has been a great deal of controversy over what is to be included in the "capital account" and over what formula should be used to determine the amount properly chargeable to the capital account when there is a qualified redemption. See, generally, Edelstein & Korbel, "The Impact of Redemption and Liquidation Distributions on Earnings and Profits: Tax Accounting Aberrations Under Section 312(e)," 20 Tax L. Rev. 479, 483–517 (1965).

By now, the courts have worked out a definition of capital account; it means the amount of capital paid into the corporation upon the issuance of its stock, whether recorded as stated capital, par, or paid-in surplus, plus its pre-March 1, 1913, earnings and profits.[4] See *Foster v. United States*, 303 U.S. 118, 121 and n. 9 (1938); *Ronald D. Anderson*, 67 T.C. 522 (1976); *Woodward Investment Co.*, 46 B.T.A. 648 (1942); *William D. P. Jarvis*, 43 B.T.A. 439 (1941), affd. 123 F.2d 742 (4th Cir. 1941); cf. sec. 1.562–1(b)(1)(ii)(*a*) and (*c*), example 1, Income Tax Regs. However, the term "capital account" must be refined further when a corporation, such as Continental, has more than one class of stock outstanding. In that situation, we have recently held in *Ronald D. Anderson* that the term "capital account," in the absence of pre-1913 earnings and profits, means the amount of paid-in capital which is clearly attributable to each specific and distinguishable class of stock.[5] See also Edelstein & Korbel, *supra* at 515. In this case, we are clearly able to distinguish and determine the specific capital account of the preferred stock, and

---

[4] The petitioner devotes much discussion to a proposal by the Commissioner in Rev. Rul. 70–531, 1970–2 C.B. 76, to include unrealized appreciation in the capital account. However, such ruling is not before us because the Commissioner, in his brief, states that he is not advancing herein the view of the revenue ruling. Moreover, we have recently rejected the position of the ruling. *Ronald D. Anderson*, 67 T.C. 522 (1976); see *Herbert Enoch*, 57 T.C. 781, 802 and n. 15 (1972); see also *GPD, Inc.*, 60 T.C. 480, 487 (1973), revd. on another ground 508 F.2d 1076 (6th Cir. 1974).

[5] As we pointed out in *Anderson* (at p. 543), it may not, in some cases, be possible, because of a shuffling in the capital structure of a corporation, to segregate its capital account according to the amounts paid in for each class of stock. Under such circumstances, an appropriate adjustment would be made. Cf. *F. & R. Lazarus & Co.*, 1 T.C. 292 (1942); *August Horrmann*, 34 B.T.A. 1178 (1936).

accordingly, that amount represents the relevant capital account for purposes of determining the effect of the preferred redemption herein.

*Anderson* also establishes the amount to be charged to the capital account of the preferred stock. In *Anderson,* we held that we would follow the rule laid down in *Helvering v. Jarvis,* 123 F.2d 742 (4th Cir. 1941), affg. 43 B.T.A. 439 (1941). Under *Jarvis,* the charge to the capital account is the percentage of such account which the redeemed shares bears to the total outstanding shares of that class of stock.[6]

Here, 50 percent of the outstanding preferred shares were redeemed, and under a literal application of the formula applied in *Jarvis,* 50 percent of the par value of the stock, $4,250, and 50 percent of the preferred paid-in surplus, $527,000, or a total of $531,250, is allocable to the capital account. However, since the distribution by Continental was only $400,000, there is a question as to whether the capital account should be charged with the entire amount allocable to it under a literal application of the *Jarvis* formula. *Jarvis* dealt with a situation wherein the stock was redeemed at a premium, i.e., at an amount in excess of the issuance price; thus, not only was the full pro rata portion of the capital account in effect distributed, but in addition, a distribution of earnings and profits was also made. In this case, the stock was redeemed at an amount below the issuance price, and consequently, not all of what was paid in is being returned. Under such circumstances, it follows that the charge to capital account cannot exceed the amount of the distribution.[7] Consequently, the par value of the preferred stock should be reduced by 50 percent, and the paid-in surplus account should be reduced by the balance of the distribution made by Continental in redemption of the preferred stock. Since the amount allocable to the capital account in this case is the full

---

[6] If the distribution is one of a series in complete liquidation and the number of outstanding shares remains unchanged, a different formula may be necessary. See *Shellabarger Grain Products Co.,* 2 T.C. 75 (1943), affd. on this issue 146 F.2d 177 (7th Cir. 1944); *Woodward Investment Co., supra;* cf. *Fowler Brothers & Cox, Inc.,* 47 B.T.A. 103 (1942), affd. 138 F.2d 774 (6th Cir. 1943).

[7] Under general accounting principles, the capital account is treated in the same manner when stock is redeemed and canceled by a corporation. See Finney & Miller, Principles of Accounting: Intermediate, p. 154 case 2 (5th ed. 1959).

amount of the distribution, the earnings and profits account remains undisturbed.[8]

*United National Corp.*, 2 T.C. 111 (1943), revd. 143 F.2d 580 (9th Cir. 1944), is the only case we have found, or that the parties have cited, which deals with the impact on a corporation's earnings and profits of a redemption of preferred stock at a discount. In that case, the issue was whether the earnings and profits of the redeeming corporation were to be increased by the amount of the discount, i.e., the amount of the issuance price for such shares remaining in the corporation after they had been redeemed. Although we stated that the amount of the savings, some $20,000, did not represent taxable gain to the corporation, we held that such tax-free profit did increase earnings and profits. The Ninth Circuit reversed, holding that a redemption by a corporation of its own shares could not give rise to an increase in earnings and profits because the transaction was exclusively one affecting the capital of the corporation; the discount represented a contribution to capital. Subsequently, in *Harold S. Divine*, 59 T.C. 152, 169 (1972), revd. on another issue 500 F.2d 1041 (2d Cir. 1974), a court-reviewed opinion, we cited with approval the Ninth Circuit's reversal of our opinion in *United National Corp.*[9] In this case, the Commissioner specifically refrains from arguing that Continental's earnings and profits should be increased by the amount of the redemption discount. Thus, the specific issue presented in *United National Corp.* is not before us; however, under both our view in that case and the Ninth Circuit's view, the amount of the discount was not eliminated from the books of the corporation. Such conclusion supports our holding herein that in applying the *Jarvis* formula, the amount of the capital account reduction cannot exceed the actual amount of the distribution.[10]

---

[8] In reaching this conclusion, we do not pass on Rev. Rul. 74–339, 1974–2 C.B. 103, which the Commissioner urges supports the conclusion herein. That ruling deals with a redemption of preferred stock at a premium, a situation not before us, and it is therefore unnecessary for us to express an opinion regarding that situation.

[9] See also *A. J. Diebold*, a Memorandum Opinion of this Court dated Feb. 18, 1953, where we also cited the reversal with approval.

[10] It should be observed that when the proper charges have been made in accordance with this opinion, the redemption discount will be reflected in the paid-in surplus account of the preferred stock. Since the Commissioner has not argued that

The petitioner advances an alternative argument for concluding that upon the redemption by Mrs. Peters, Continental's earnings and profits should be reduced. He points out that under section 306, a distribution in redemption of section 306 stock is generally taxable under section 301 and is chargeable to earnings and profits under section 312(a). He claims that the preferred stock transferred by the partnership to Mrs. Peters was section 306 stock based on the following reasoning: The parties have stipulated that the litigation involving the Hanover Bank was settled by the payment of $400,000, although the payor of such amount was not expressly stipulated. According to the petitioner, Continental paid that amount and then issued such shares to the partnership as a stock dividend. Consequently, he concludes such shares constituted section 306 stock, presumably under section 306(c)(1)(A).[11] Such conclusion is consistent, the petitioner urges, with the stipulation that such shares "were then held" by the partnership, as indicating that the partnership did not acquire the shares directly from the Rainforth Trust. The petitioner also points out that the partnership treated $500, the amount it paid for Continental's common stock, as its basis in both the common and the preferred, to support his contention that the preferred stock was a stock dividend to the partnership and that it paid nothing for it.[12]

The stipulation of the parties hardly supports the petitioner's contention. No direct evidence of record establishes that Continental paid the $400,000 and distributed the

---

such amount should be moved to any other account, and since a decision on that matter would have no effect on the outcome of this case, we do not decide whether we would still adhere to our position in *United National Corp.*, 2 T.C. 111 (1943).

[11] (c) SECTION 306 STOCK DEFINED.—

(1) IN GENERAL.—For purposes of this subchapter, the term "section 306 stock" means stock which meets the requirements of subparagraph (A), (B), or (C) of this paragraph.

(A) DISTRIBUTED TO SELLER.—Stock (other than common stock issued with respect to common stock) which was distributed to the shareholder selling or otherwise disposing of such stock if, by reason of section 305(a), any part of such distribution was not includible in the gross income of the shareholder.

[12] The petitioner obviously contends that the assumed stock dividend to the partnership was not taxable to it under sec. 305(a); otherwise, the stock could not qualify as sec. 306 stock. See sec. 306(c)(1)(A). In addition, if the partnership were taxed upon the receipt of such stock dividend, then it would have an independent basis in such stock. See secs. 305(b) and 301(d)(1).

preferred stock to the partnership. Such facts, if true, could easily have been stipulated or established by documentary evidence; yet, neither course was followed. On this record, we are simply unable to accept the petitioner's factual assertions, made in his brief, and unsupported by the record. Cf. *Joseph D. Kwong*, 65 T.C. 959, 967 n. 11 (1976); *Frank J. Evans*, 48 T.C. 704, 709 (1967), affd. per curiam 413 F.2d 1047 (9th Cir. 1969); *Irene Vavasour Elder Perkins*, 40 T.C. 330, 340 (1963). Indeed, what is stipulated lends itself to the interpretation that the partnership supplied the funds for the payment to Hanover Bank and thereby acquired the stock. In addition, the parties have stipulated that from the time of Continental's incorporation until the redemption of the Peters' stock, its capital account remained unchanged, as set forth earlier in this opinion. Thus, such account does not reflect the fact that Continental redeemed such shares from Hanover Bank and reissued them as a stock dividend. However, we do not rest our rejection of the petitioner's argument simply on his failure to establish his factual assertions, because, even assuming the facts are as he has stated, there are two independent reasons for concluding that Mrs. Peters' redemption would not be controlled by section 306.

First, if Continental had distributed the preferred stock to the partnership in December 1959, it could not have been section 306 stock. Sections 306(c)(2)[13] excludes from the definition of section 306 stock a distribution of stock if the distributing corporation has neither accumulated earnings and profits at the time of the distribution, nor current earnings and profits at the close of the taxable year in which the distribution was made. See sec. 316(a)(1) and (2); sec. 1.316–1(a)(1), Income Tax Regs. Continental had no accumulated earnings and profits because it was in its first year of operation, and at the end of Continental's first taxable year, ending in August 1960, its tax return showed a deficit in

---

[13] (c) SECTION 306 STOCK DEFINED.—
* * *

(2) EXCEPTION WHERE NO EARNINGS AND PROFITS.—For purposes of this section, the term "section 306 stock" does not include any stock no part of the distribution of which would have been a dividend at the time of the distribution if money had been distributed in lieu of the stock.

earnings and profits. Therefore, a distribution of preferred stock during that year could not be section 306 stock.

Secondly, on the date Mrs. Peters had such stock redeemed, she was her husband's sole heir, and the parties have stipulated that the partnership no longer owned any of Continental's common or preferred stock—Mr. Maxey individually owned 50 shares of Continental's common, and the remaining shares of common and preferred were owned by the petitioner. Thus, Mrs. Peters' redemption of the preferred stock qualified under section 302(a), as stipulated by the parties, by virtue of section 302(b)(3)[14] because it constituted a complete redemption of all the shares held by the estate of Mr. Peters, either actually or constructively under section 318(a). Section 306(b)(1)(B)[15] provides that a distribution, made in a redemption which qualifies under section 302(b)(3), shall not be treated, under section 306(a), as a distribution to which section 301 applies.

The last issue for decision is whether Continental, a cash method corporation, may deduct from its earnings and profits taxes which accrue during a taxable year but which are not paid until a subsequent year. The relevant Treasury regulations have long provided that a corporation in computing its earnings and profits for a taxable year must follow the same accounting method it uses for computing its taxable income. Sec. 1.312–6(a), Income Tax Regs. Consequently, under the regulations, it is clear that Continental may deduct its taxes only in the year of payment and not in the year of accrual.

There exists a conflict among the circuits on this issue— three of them allow a cash method taxpayer to reduce its earnings and profits by the amount of accrued but unpaid taxes (*Demmon v. United States*, 321 F.2d 203 (7th Cir. 1963); *Drybrough v. Commissioner*, 238 F.2d 735 (6th Cir. 1956),

---

[14] (b) REDEMPTIONS TREATED AS EXCHANGES.—
* * *

(3) TERMINATION OF SHAREHOLDER'S INTEREST.—Subsection (a) shall apply if the redemption is in complete redemption of all of the stock of the corporation owned by the shareholder.

[15] (b) EXCEPTIONS.—Subsection (a) shall not apply—

(1) TERMINATION OF SHAREHOLDER'S INTEREST.—
* * *

(B) IN REDEMPTION.—If the disposition is a redemption and section 302(b)(3) applies.

remanding *United Mercantile Agencies, Inc.,* 23 T.C. 1105 (1955); *Hadden v. Commissioner,* 49 F.2d 709 (2d Cir. 1931), revg. 17 B.T.A. 956 (1929)), and one of them allows taxes to reduce the earnings and profits of a cash method taxpayer only in the year of payment (*Helvering v. Alworth Trust,* 136 F.2d 812 (8th Cir. 1943), revg. 46 B.T.A. 1045 (1942), cert. denied 320 U.S. 784 (1943)). In *M. H. Alworth Trust,* 46 B.T.A. 1045 (1942), we held that a cash method taxpayer could reduce its earnings and profits by accruable taxes, but subsequent to the Eighth Circuit's reversal of our opinion in that case, we have consistently followed that reversal and have not allowed cash method taxpayers to reduce their earnings and profits on account of accrued but unpaid taxes. *Paulina duPont Dean,* 9 T.C. 256, 266–267 (1947), affd. on other grounds 187 F.2d 1019 (3d Cir. 1951); *United Mercantile Agencies, Inc.,* 23 T.C. 1105, 1114–1115 (1955); *Joseph B. Ferguson,* 47 T.C. 11, 31–34 (1966).

*Ferguson* arose when there were already the contrary holdings by the three Circuit Courts of Appeals, and in the light of such holdings, we carefully reexamined our position and decided to adhere to it. All accrued but unpaid expenses represent a realistic and economic cost to a cash method corporation, but no reason has been advanced in any of the cases for treating accrued taxes differently from other accrued but unpaid expenses.[16] The decisions that have treated taxes differently are not persuasive because they were either decided under a statutory and regulatory scheme different from that now in existence, or their rationale was based upon certain fallacies. *Hadden v. Commissioner, supra,* was decided under section 31 of the Revenue Act of 1916, as added by section 1211 of the Revenue Act of 1917, which defined a taxable dividend as a distribution made by a corporation out of "earnings or profits *accrued*" since March 1, 1913. (Emphasis supplied.) Thus, the statute itself seemed to place all taxpayers, regardless of their accounting method, on an accrual method for purposes of calculating their earnings and profits. Furthermore, the court, in that case,

---

[16] The use of the cash method of accounting has certain advantages and disadvantages in computing earnings and profits. Under such method, accrued but unpaid taxes will not reduce earnings and profits; however, accrued but unreceived income will not increase earnings and profits.

cited regulations of the Commissioner which provided that "In ascertaining whether or not a distribution was made out of earnings or profits of the taxable year there should first be set aside a proper reserve for the payment of accrued income and war profits and excess profits taxes." Art. 1542, Regs. 45. However, in section 201(a) of the Revenue Act of 1918, the successor of section 31 of the Revenue Act of 1916, the word "accrued" was changed to "accumulated," the term used in section 316. In addition, in 1941, the Commissioner amended section 19.115–3 of Regs. 103, the predecessor of section 1.312–6(a), Income Tax Regs., to provide explicitly that in computing earnings and profits a corporate taxpayer was to follow the method of accounting employed in computing its taxable income. Consequently, there is no longer any statutory or regulatory basis for the conclusion in *Hadden.*

Nor is the opinion in *Drybrough* persuasive for a number of reasons. First of all, the court never cited or discussed the relevant regulations, even though the Supreme Court has stated that they are entitled to great weight. See, e.g., *Bingler v. Johnson,* 394 U.S. 741, 749–750 (1969); *Commissioner v. South Texas Lumber Co.,* 333 U.S. 496, 501 (1948). Indeed, in direct conflict with the rule of the regulations, the Sixth Circuit stated:

> Whether a corporation keeps its accounts and makes its returns on the cash or accrual basis is a question generally relevant only in determining its own income and deductions as a taxpayer. * * * [238 F.2d at 738.]

In addition, *Drybrough* involved a situation wherein officer-shareholders had diverted to themselves, over a number of years, more than $200,000 of the corporation's gross income, on which it would have been subject to a 95-percent excess profits tax. The corporation ultimately paid the taxes on such amount and the court held that the diversions constituted taxable dividends to the extent of the earnings and profits of the corporation. The court reasoned that if earnings and profits were not reduced by the amount of the accrued taxes, the shareholders would be taxed at ordinary rates for what the court considered to be a distribution of capital. However, the belief that the amounts distributed represented capital was precisely the question to be decided, and the court's conclusion assumes that there must necessarily exist a correlation between general corporate law concepts of capital

and earned surplus and the Federal tax concepts of capital and earnings and profits, an assumption which is not correct. Such an assumption was expressly rejected by the Supreme Court in *Commissioner v. Wheeler*, 324 U.S. 542, 546 (1945), when it said:

It was no doubt permissible and perhaps the correct accounting, for determining earned surplus for dividends and such corporate purposes, for the corporation to set up its books on the market value of its property at the time of acquisition * * *. But "earnings and profits" in the tax sense, although it does not correspond exactly to taxable income, does not necessarily follow corporate accounting concepts either. * * * [Fn. ref. omitted.]

See also *Joseph B. Ferguson*, 47 T.C. at 32.

Furthermore, in *Drybrough* the court did not hold, as a general rule, that a cash method taxpayer could subtract accrued taxes from its earnings and profits; rather, it concluded merely that "Both common sense and realism require the conclusion that the corporate taxes attributable to the diverted income should be excluded from the corporation's earnings and profits under the circumstances of this case." 238 F.2d at 740. Finally, *Drybrough* offers no adequate explanation for its singling out of taxes for such treatment, while not doing so for other accrued but unpaid expenses. The opinion of the Seventh Circuit in *Demmon v. United States* relies primarily on *Drybrough;* consequently, the same objections are applicable to it. For these reasons, we remain convinced of the soundness of the view adopted by this Court in *Paulina duPont Dean, supra; United Mercantile Agencies, Inc., supra;* and *Joseph B. Ferguson, supra.*

The petitioner contends that the Fifth Circuit, in *Rose v. Dobbs*, 36 F.2d 464 (1929), has already spoken on this issue, taking a position contrary to ours, and he asserts that under *Jack E. Golsen*, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971), we are committed to follow *Rose v. Dobbs* in this case. That case involved the question of the taxability of certain cash distributions made by Coca Cola during 1917 to Mr. Dobbs, one of its shareholders. That question depended in part upon a determination of such corporation's earnings and profits during 1917. The District Court found that Coca Cola followed an accrual method of accounting for its taxes (*Dobbs v. Rose*, 27 F.2d 168,

169 (N.D. Ga. 1928)); accordingly, the corporation reduced its earnings and profits for 1917 by the amount of taxes it accrued during such year, although not paid until 1918. However, in 1922, the corporation received a refund of part of its 1917 taxes. The court held that such refund increased Coca Cola's earnings and profits for 1917 and could be considered in the taxability of distributions made during that year. Thus, the court concluded that a tax refund relates back and increases earnings and profits in the year when, under the accounting method followed by the corporation, such taxes were subtracted from earnings and profits.

Although we find it unnecessary to express our view on the court's relation-back doctrine, such an approach lends no support to the petitioner's position because it is neutral in determining in what year a cash method taxpayer should *initially* subtract taxes from its earnings and profits account. In *Rose,* the court had before it an accrual method corporation, so naturally taxes were originally subtracted from the earnings and profits account in the year of accrual. Nothing in the court's view of relation back implies that a cash method taxpayer should originally reduce its earnings and profits in the year taxes accrue, rather than in the year of their payment. Thus, we conclude that the Fifth Circuit has not spoken on the issue before us, and accordingly, Continental may not reduce its earnings and profits by accrued but unpaid taxes.

*Decision will be entered under Rule 155.*