14 F.3d 923
 73 A.F.T.R.2d 94-1068, 62 USLW 2481, 94-1
USTC P 50,058
 MAZZOCCHI BUS CO., INC., Appellant,
v.
COMMISSIONER OF INTERNAL REVENUE SERVICE.
Nicholas MAZZOCCHI; Estate of Rose Marie Mazzocchi,
Deceased, Mary Mazzocchi, Executrix,
v.
COMMISSIONER OF INTERNAL REVENUE SERVICE.
 No. 93-7311.
 United States Court of Appeals,
Third Circuit.
 Submitted under Third Circuit LAR 34.1(a)
 Dec. 7, 1993.
Decided Jan. 27, 1994.
 
 Douglas R. Eisenberg, Thomas S. Carles, Carles & Eisenberg, Parsippany, NJ, for appellant.
 William J. Patton, Michael L. Paup, Gary R. Allen, Richard Farber, Teresa E. McLaughlin, U.S. Dept. of Justice, Tax Div., Washington, DC, for appellee.
 Before: BECKER, NYGAARD, and WEIS, Circuit Judges.
 OPINION OF THE COURT
 BECKER, Circuit Judge.
 
 
 1
 This appeal is from a decision of the United States Tax Court which upheld the Commissioner's determination of federal income tax deficiencies for the years 1974 through 1979 against Mazzocchi Bus Co., Inc. ("MBC"), a closely-held corporation; Nicholas Mazzocchi ("Mazzocchi"), its controlling shareholder; and the estate of Mazzocchi's late wife Rose Marie Mazzocchi, who had filed joint returns with him.[1] The Commissioner's determination stems from Mazzocchi's diversion of receipts totalling more than $700,000 from MBC for his personal use and benefit during the years in question, taken together with his failure to report that income on both his and MBC's tax returns.
 
 
 2
 The principal question presented by the appeal is whether MBC, a corporation using the cash method of accounting for computing its income taxes, should be entitled to use the accrual method for calculating its earnings and profits.[2] As applied to the facts, the question is whether the tax court correctly held that the earnings and profits of MBC during the taxable years in question should not be reduced by income taxes, penalties, and interest owed but not paid by the corporation during those years. Relying on a reasonable Treasury regulation directly on point, we conclude that the tax court properly held that MBC must use the same accounting method for calculating its earnings and profits as it uses in calculating its income taxes. Finding no merit to the taxpayer's remaining contentions, with which we deal summarily, see infra at 933 n. 19, we will affirm.
 
 I. FACTS AND PROCEDURAL HISTORY
 
 3
 Mazzocchi was the president and controlling shareholder of MBC, which engaged in the school bus transportation business. During the years in question, MBC failed to record in its cash receipts books numerous checks constituting large payments for transportation services MBC provided several schools, and concomitantly failed to report those checks as receipts on its income tax returns. More precisely, for its fiscal years 1975 through 1978, MBC earned unreported business receipts in the respective amounts of $129,558.81, $188,710.47, $185,774.56, and $151,051.25. In the fiscal year ended June 30, 1979, MBC failed to include on its corporate tax return income in the amount of $56,575.02.
 
 
 4
 The omitted checks were mainly customer checks issued to Mazzocchi and/or MBC, 60 of which contained the single endorsement of Mazzocchi and 19 of which contained the initial endorsement of MBC followed by the second endorsement of Mazzocchi. As MBC's president, Mazzocchi was able surreptitiously (without the knowledge of corporate accountants or other officers) to negotiate these checks either at Midlantic Bank or the First National State Bank of West Jersey, thus affecting the diversion. During the corporation's 1975 through 1978 fiscal years, Mazzocchi utilized $371,126 of the unreported corporate business receipts to make commercial paper investments in his name at Midlantic Bank; he invested an additional $91,359 in commercial paper at Midlantic from undetermined sources. In due course, he rolled over or redeemed much of these investments. Having learned of bank reporting requirements from an Internal Revenue Service ("IRS") special agent, he structured his subsequent withdrawals so that he simultaneously received multiple cashier's checks, each in an amount under $10,000. During the years 1975 through 1979, Mazzocchi earned interest income on his commercial paper investments at Midlantic totalling over $88,000, but either failed to report or substantially underreported this interest income on his tax returns for each of those tax years.
 
 
 5
 The IRS ultimately commenced a criminal investigation of the business affairs of MBC and Mazzocchi, leading to Mazzocchi's indictment for income tax evasion. On October 30, 1981, he pleaded guilty to attempted willful evasion of his individual income taxes in violation of Sec. 7201 of the Internal Revenue Code ("Code") for the year 1976.[3] Later, in 1986, the Commissioner determined that Mazzocchi had diverted money from MBC for his personal use and benefit and had failed to report it both on the joint returns he filed with his wife and on MBC's tax returns. Consequently, the Commissioner assessed the tax deficiencies and additions for fraud to the taxes against Mazzocchi and MBC which are at issue here.
 
 
 6
 The taxpayers challenged the Commissioner's deficiency determinations in the tax court, but the tax court rejected their efforts and held for the Commissioner. The court concluded that Mazzocchi had fraudulently diverted funds from MBC for his personal use and benefit and that neither Mazzocchi nor MBC had reported the proceeds on Mazzocchi's individual or MBC's corporate tax returns, respectively.
 
 
 7
 Mazzocchi additionally argued to the tax court that the earnings and profits of MBC, a cash basis taxpayer, should be reduced in the years at issue by the amount of accrued but unpaid taxes, penalties, and interest attributable to its income tax deficiencies for those years. This argument is premised on the Code's treatment of corporate distributions out of earnings and profits as ordinary income but its differing treatment of corporate distributions in excess of earnings and profits as either a return of capital or a capital gain, depending on the taxpayer's basis in the corporate securities. Had Mazzocchi prevailed on that point, then some unspecified portion of the income Mazzocchi diverted from MBC (depending on MBC's earnings and profits in the relevant tax years, an issue the tax court did not resolve) would represent some combination of a nontaxable return of capital and a capital gain with respect to Mazzocchi (in turn depending on his basis in the corporate securities), instead of a constructive dividend taxable at ordinary income tax rates. The tax court, however, rejected his argument, reasoning that there was no basis to adjust earnings and profits for unpaid expenses incurred by MBC, a cash basis taxpayer.
 
 
 8
 The tax court also declined Mazzocchi's invitation to reduce his and MBC's unreported income by the business expenses that he claims he paid in cash on behalf of MBC with the unreported funds. Mazzocchi testified that he spent between $50,000 and $75,000 cash in each of the relevant tax years entertaining MBC's clients. However, the court determined that Mazzocchi's generalized and uncorroborated testimony did not meet the substantiation requirements set by Sec. 274(d) of the Code and its implementing regulation, see Treas.Reg. Sec. 1.274-5, for deducting such expenses. The court also refused to allow deductions for funds Mazzocchi declared that he expended on wages, equipment, and renovations to MBC's corporate headquarters. The court found that expenditures for summer bus driver wages and equipment purchases had already been taken into account as deductions on MBC's corporate returns for each of the years in issue. Furthermore, it decided that Mazzocchi and MBC had failed to establish the year in which Mazzocchi (allegedly) paid in cash for the renovation of MBC's corporate headquarters, or to substantiate the amounts he (allegedly) so expended.
 
 
 9
 The tax court also sustained the imposition of civil fraud penalties against both Mazzocchi and MBC. The court found that Mazzocchi: furtively arranged to have payments from his major school customer made directly to him; cannily arranged to have that school issue him checks in amounts under $10,000; willfully failed to apprise MBC's bookkeeper of his cash receipts; and purposefully withdrew the diverted funds from his accounts in a series of transactions structured to avoid detection by the IRS. In short, the court found that Mazzocchi carried out "the diversion of corporate funds ... in this manner with the purpose and design of concealing their existence and avoiding income tax on these amounts." Additionally, the court found that Mazzocchi made false representations to an IRS special agent investigating his tax liabilities. In sum, the court concluded the Commissioner had presented clear and convincing evidence of Mazzocchi's willful evasion of taxes, see I.R.C. Sec. 7454(a).
 
 
 10
 Finally, the tax court determined that Mazzocchi, in view of his conviction under Sec. 7201 of the Code for willfully attempting to evade taxes he owed for the tax year 1976, was collaterally estopped from asserting that no portion of the underpayment determined against him for 1976 was due to fraud. See I.R.C. Sec. 6653(b). The court, citing Amos v. Commissioner, 43 T.C. 50, 55-57, 1964 WL 1366 (1964), aff'd, 360 F.2d 358 (4th Cir.1965), held that a conviction under Sec. 7201 "necessarily carries with it the ultimate factual determination that part of the deficiency for the tax year involved was due to fraud as encompassed in section 6653(b)."
 
 
 11
 As we alluded to earlier, we chiefly focus on Mazzocchi's contention that a cash basis corporation should be allowed to deduct accrued but unpaid tax liabilities from its earnings and profits. We address the defendants' other arguments summarily infra at 933 n. 19.
 
 II. DISCUSSION
 A.
 
 12
 Whether a cash basis corporation is entitled to compute earnings and profits by deducting liabilities for accrued but unpaid income tax and penalties, and interest thereon, is a question of law over which we exercise plenary review. It is also one of first impression in this Court.
 
 
 13
 The Code generally treats corporate distributions (or dividends) out of earnings and profits as ordinary income to the shareholder taxpayer. But if a corporation pays a dividend which exceeds its earnings and profits (as measured by Sec. 316(a)), the Code treats that portion of the dividend as a nontaxable return of capital to the shareholder taxpayer to the extent of the taxpayer's basis in the securities, and as a capital gain to the taxpayer once the taxpayer's basis is exhausted. See I.R.C. Secs. 301(c), 316(a).[4] See generally James A. Swartz, Note, The Controversy Surrounding the Adjustment of Earnings and Profits for Accrued Taxes by a Cash Method Taxpayer: How Should the Conflict Be Resolved?, 42 TAX LAW. 821, 822-23 (1989). From the perspective of Mazzocchi's tax liability, characterizing the income as return of capital and/or capital gain is favorable since a return of capital is nontaxable and, as a rule (we are referring to the 1979 Code), capital gain is taxed at a substantially lower rate than ordinary income, see I.R.C. Sec. 1202.
 
 
 14
 The framework described above is relevant to this case because diverted corporate funds are treated as a constructive dividend to the taxpayer and, to the same extent, augment the corporation's taxable income (and hence its earnings and profits). See I.R.C. Sec. 316(a) (defining a dividend as a distribution of property out of earnings and profits); e.g., Commissioner v. Makransky, 321 F.2d 598, 601-03 (3d Cir.1963); Truesdell v. Commissioner, 89 T.C. 1280, 1295-1301, 1987 WL 258105 (1987). See generally BORIS I. BITTKER & JAMES S. EUSTICE, FEDERAL INCOME TAXATION OF CORPORATIONS AND SHAREHOLDERS p 7.05 (5th ed. 1987) [hereinafter FEDERAL INCOME TAXATION]. In other words, the Code would treat the funds Mazzocchi diverted as income to MBC (inflating its earnings and profits), which income MBC then straightaway constructively disbursed to Mazzocchi as dividends.
 
 
 15
 Thus, assuming MBC did not suffer lost earnings and profits in the relevant years, a determination of a deficiency would increase MBC's earnings and profits by the amount of the deficiency and render all the diverted funds ordinary income to Mazzocchi. See I.R.C. Sec. 301(c)(1). If MBC were able to reduce its earnings and profits by deducting therefrom the accrued (but unpaid) tax liabilities assessed against it in this action, the result would likely be to convert much of the constructive distribution to Mazzocchi into either a nontaxable return of capital or a capital gain, depending on Mazzocchi's basis in MBC shares. Thereby Mazzocchi's federal income tax deficiency and, correspondingly, the penalties and interest assessed against him, would be substantially reduced.
 
 
 16
 Of course, if MBC is not allowed to deduct the accrued tax liability from its earnings and profits in the relevant years, as a cash basis taxpayer it will be able to deduct those sums from its earnings and profits in the year it pays its back taxes. Accordingly, what is at issue here is only the timing of MBC's deduction of the income tax deficiency, penalties, and interest from its earnings and profits; under the cash basis method MBC would deduct it in the year paid (probably 1994), whereas under the accrual method it would deduct in each of the respective years 1975 through 1979 the amount accrued in that year.
 
 
 17
 To sustain his contention that a cash basis corporation may not employ the accrual method for determining its earnings and profits, the Commissioner principally relies on Treasury Regulation Sec. 1.312-6 ("Earnings and Profits"[5]). Specifically, Sec. 1.312-6 provides in relevant part:
 
 
 18
 In determining the amount of earnings and profits ... due consideration must be given to the facts, and, while mere bookkeeping entries increasing or decreasing surplus will not be conclusive, the amount of the earnings and profits in any case will be dependent upon the method of accounting properly employed in computing taxable income.... For instance, a corporation keeping its books and filing its income tax returns ... on the cash receipts and disbursement basis may not use the accrual basis in determining its earnings and profits....
 
 
 19
 Id. (emphasis added). As the Commissioner points out, we owe substantial deference to regulations issued by the agency Congress entrusted to administer the statute. See, e.g., Cottage Sav. Ass'n v. Commissioner, 499 U.S. 554, 111 S.Ct. 1503, 1508, 113 L.Ed.2d 589 (1991) ("[W]e must defer to [the Commissioner's] regulatory interpretations of the Code so long as they are reasonable.").
 
 
 20
 We note in this regard that the Supreme Court approved a precursor to Sec. 1.312-6(a) in Commissioner v. South Tex. Lumber Co., 333 U.S. 496, 68 S.Ct. 695, 92 L.Ed. 831 (1948), reh'g denied, 334 U.S. 813, 68 S.Ct. 1014, 92 L.Ed. 1744 (1948). Although that case arose under the excess profits tax, that tax used the same "accumulated earnings and profits" language which is contained in the current Sec. 316. See id. at 500 n. 7, 68 S.Ct. at 698 n. 7. In upholding a Treasury Regulation in pertinent respects remarkably similar to the one at issue here,[6] the Court rejected an attempt by a corporation which kept the relevant portion of its books using the installment method to use the accrual method in computing its earnings and profits:
 
 
 21
 This Court has many times declared that Treasury regulations must be sustained unless unreasonable and plainly inconsistent with the revenue statutes and that they constitute contemporaneous constructions by those charged with administration of these statutes which should not be overruled except for weighty reasons.
 
 
 22
 This regulation is in harmony with the long-established congressional policy that a taxpayer generally cannot compute income taxes by reporting annual income on a cash basis and deductions on an accrual basis. Such a practice has been uniformly held inadmissible because it results in a distorted picture which makes a tax return fail truly to reflect net income.
 
 
 23
 Id. at 501, 68 S.Ct. at 698-99 (citation omitted).
 
 
 24
 We owe the regulation heightened deference on account of its protracted history. See Cottage Sav. Ass'n, 499 U.S. at 560-62, 111 S.Ct. at 1508 ("Treasury regulations and interpretations long continued without substantial change, applying to unamended or substantially reenacted statutes, are deemed to have received congressional approval and have the effect of law." (internal quotations omitted)). The Commissioner adhered to the IRS' longstanding practice when he first promulgated the regulation at issue here in 1955. See T.D. 6152, 1955-2 C.B. 61, 104-05 (promulgating the regulation);[7] T.D. 5059, 1941-2 C.B. 125, 125-26 (Treasury decision issued to tax collectors containing virtually the identical language later incorporated into Sec. 1.312-6(a)); G.C.M. 2951, VII-1 C.B. 160, 160-61 (General Counsel Memorandum 1928);[8] see also I.T. 3253, 1939-1 C.B. 178, 178-79 (corporation keeping its books on the accrual basis may deduct accrued taxes in the computation of its earnings and profits).
 
 
 25
 The tax court has also long adhered to the view that a cash basis taxpayer cannot deduct accrued but unpaid taxes from earnings and profits. See slip op. at 11. As far as we can tell, since the Eighth Circuit reversed the tax court in Alworth Trust v. Commissioner, 46 B.T.A. 1045 (1942), rev'd sub nom. Helvering v. Alworth Trust, 136 F.2d 812 (8th Cir.1943), cert. denied, 320 U.S. 784, 64 S.Ct. 193, 88 L.Ed. 471 (1943), aside from cases acquiescing in a relevant court of appeals' contrary precedent, see infra, the tax court has consistently applied Alworth Trust.
 
 
 26
 Nonetheless, several old court of appeals opinions have come out otherwise, holding that a cash-basis corporation may deduct accrued but unpaid taxes from its earnings and profits. See Demmon v. United States, 321 F.2d 203, 204-06 (7th Cir.1963); Drybrough v. Commissioner, 238 F.2d 735, 738-40 (6th Cir.1956); Hadden v. Commissioner, 49 F.2d 709, 712 (2d Cir.1931).[9] The Commissioner's brief and the tax court, see, e.g., Webb v. Commissioner, 67 T.C. 1008, 1018, 1977 WL 3760 (1977), with whom we side, both provide incisive criticisms of the reasoning those appellate decisions utilized and advance cogent arguments why the applicable Treasury regulation is a reasonable construction of the Code which should govern the resolution of this question.[10]
 
 B.
 
 27
 Drybrough primarily relied on cases which had allowed accrual method corporations to reduce earnings and profits by the amount of disputed federal taxes despite the fact that an accrual corporation generally cannot deduct disputed taxes from its income. Building on the reasoning those cases employed, the court in Drybrough engrafted a more discernible distortion onto the Code when it concluded that cash method corporations should also be permitted to reduce earnings and profits by the amount of accrued taxes. See id., 238 F.2d at 739. We decline to brandish those ancient cases to fashion a similar rule, for as Professors Bittker and Eustice have commented persuasively, in computing earnings and profits, both the deduction of disputed taxes by an accrual basis corporation as well as the accrual of taxes by a cash basis corporation are "departures from normal tax accounting principles [that] add to the complexity of this area, without making any offsetting contribution to rationality." BITTKER & EUSTICE, FEDERAL INCOME TAXATION p 7.04 at 7-22 to 7-23. The Commissioner forcefully argues, and we agree, that one objectionable departure from normal tax accounting practices does not justify another.[11]
 
 
 28
 We also take issue with the rationale expressed in Drybrough that general corporate law and accounting concepts of dividends and impairment of capital control the computation of earnings and profits for purposes of federal taxation. See 238 F.2d at 739 (quoting Alworth Trust, 46 B.T.A. at 1047).[12] As the tax court observed in Webb, Drybrough evidently "assumes that there must be some correlation between general corporate law concepts of capital and earning surplus and the Federal income tax concepts of capital and earnings and profits, an assumption which is not correct." Webb, 67 T.C. at 1020-21. Similarly, the Eighth Circuit Court of Appeals held in Alworth Trust that it is improper to "read[ ] into the definition of 'dividend' [in the income tax context] the general law relating to the right of a corporation to declare dividends." 136 F.2d at 814.[13] Given the disparate purposes behind the federal tax code and the corporate law impairment of capital doctrine, we agree.[14]
 
 
 29
 In Alworth Trust the Court went on to observe that tax returns would not clearly reflect income "unless distributions made by a corporation and received by its stockholders are treated consistently." 136 F.2d at 815. The goal of having tax returns clearly reflect taxable income would not be achieved by permitting corporations to pick and choose whether or not to have "gross income actually received by the stockholder ... diminished by taxes neither accrued nor paid by the corporation in the taxable year, even though [later] imposed upon the earnings of that year." Ibid. Once again, we agree. Granting the corporation the option to use either method of accounting for earnings and profits, regardless of the accounting method used to calculate its income tax, would substantially skew tax liability in favor of the shareholder without any offsetting increase in rationality or accuracy. See infra Part II.C.
 
 
 30
 The Seventh Circuit Court of Appeals in Demmon, supra, relied upon Drybrough and Simon v. Commissioner, 248 F.2d 869 (8th Cir.1957) in resolving that "both reason and authority" support the argument that a cash basis corporation may deduct its accrued and unpaid taxes in computing earnings and profits. We do not share the Demmon court's view that Simon supports its result, and, insofar as we believe Drybrough to be flawed, we think so is Demmon.[15]
 
 
 31
 Finally, we do not consider the archaic case of Hadden, supra, as authority for the proposition that a cash basis taxpayer may take accrued but unpaid taxes into account in computing earnings and profits. Hadden was decided under Section 31 of the Revenue Act of 1917, which defined a taxable dividend as a distribution made by a corporation out of "earnings and profits accrued " since March 1, 1913. See 49 F.2d at 712 (emphasis added). The result there clearly turned upon the peculiar wording of the statute and regulations then in effect.[16]
 
 
 32
 Congress revised the statutory definition of dividend in 1918, however, from a distribution made out of earnings and profits accrued since March 1, 1913 to its present form, a distribution made out of earnings and profits accumulated since February 28, 1913. Webb, 67 T.C. at 1020. On top of that evolution, Treasury Regulation Sec. 1.312-6(a) and its predecessors have provided since at least 1955 that a corporate taxpayer was to follow the method of accounting employed in computing its taxable income in computing its earnings and profits. See supra at 929. We consequently agree with the tax court that "there is no longer any statutory or regulatory basis for the conclusion in Hadden." Webb, 67 T.C. at 1020.
 
 C.
 
 33
 Finally, we consider Mazzocchi's assertion that "[c]ourts which have reduced earnings and profits by accrued but unpaid income tax liability have done so with the understanding that earnings and profits are intended to provide a measure of the ability of the Corporation to make distributions which are not out of its capital." That much is certainly true, but even if a Treasury regulation did not tie our hands, it is far from clear that the cash method does not accomplish that goal equally well. Earnings and profits ideally represent what the corporation has earned, whether during that fiscal year or since its inception, in excess of capital invested in it. But we think that in many cases, contrary to the suggestion of Mazzocchi, the cash method accurately reflects that amount, for it treats as earnings and profits the difference between the amount of cash received or gained and the amount of cash spent, depleted, or lost that year.
 
 
 34
 The cash basis method is not always meticulously accurate, as is illustrated by the case sub judice: a corporation may be deemed to have earnings and profits in one year although in a later year it has to pay taxes (or judgments, liabilities, or other losses) attributable to income earned in the earlier year, which exaggerates in the earlier year (but, by the same token, understates in the later year) the corporation's ability to distribute dividends. But the accrual system also has its drawbacks from an economic perspective. To take but one example, since the corporation has not yet collected the receipts it has accrued, it cannot distribute them (unless it takes out a loan with the accrued income as security, but economically that would be equivalent to selling the accrued income for present cash, rendering the modified accrual method akin to the cash method), and thus the accrual system may also overstate in the current year (and conversely understate in a later year) the corporation's ability to distribute dividends. In short, neither the cash nor the accrual method of accounting may accurately represent in an economic sense the amount of net assets that a corporation has available to distribute as dividends to its shareholders during any given year. Some inaccuracies inhere in the administrative necessity artificially to divide time into discrete years for tax purposes.
 
 
 35
 We find several significant drawbacks to Mazzocchi's suggested approach allowing a corporate taxpayer the freedom to choose which accounting system to use for calculating earnings and profits irrespective of the accounting method it uses to calculate its taxable income. First, it would tend to skew substantially the payment of taxes in favor of the taxpayer's shareholders, as the taxpayer will choose whichever method minimizes its shareholders' tax liability. The distortion would be compounded by the fact that the method used for computing earnings and profits is often not an issue until substantial tax liabilities devolve on it. For instance, the issue of the proper accounting method apparently did not arise in this case until after the Commissioner assessed tax deficiencies against the defendants, many years after the tax years involved closed. Undoubtedly, were it to prove advantageous to Mazzocchi, he would now be arguing that the cash method was the proper one for MBC to utilize when calculating its earnings and profits. Second, to allow the choice would impose upon the Commissioner the burden of maintaining--and auditing--two sets of books for each taxpayer electing inconsistent accounting methods for income and earnings and profits purposes.
 
 
 36
 Moreover, one desires no less accuracy when computing the corporation's ability to generate income than when computing the corporation's ability to distribute dividends. In other words, whatever subsequent events detract from or enhance a cash basis corporation's ability to generate dividends in a given year equivalently detract from or enhance its ability to generate income.[17] To accommodate the needs of different taxpayers, the Code allows corporations the flexibility to embrace at its sole discretion[18] either the cash or accrual method (or one of several other available alternatives) for income tax purposes simply by adopting that method for keeping its books. See I.R.C. Sec. 446(c). If the corporation feels that the cash basis accurately reflects its income, then it is hard to comprehend why it should be heard to deny that the same method accurately reflects its earnings and profits.
 
 D.
 
 37
 In conclusion, we hold that the tax court correctly rejected Mazzocchi's argument that the earnings and profits of MBC, a cash basis corporation, should be reduced by the amount of accrued but unpaid taxes, penalties, and interest attributable to its income tax deficiencies for the years in issue. To preclude the distortion of tax liability and to spare the Commissioner the concomitant onerous bookkeeping tasks which would follow from a corporation's using one accounting method to compute income while using a different accounting method to calculate earnings and profits, Sec. 1.312-6(a) of the Treasury regulations has long provided that a corporation must use the same accounting method in calculating earnings and profits as it uses in determining its taxable income. We harbor no doubts that this long-standing Treasury regulation is a permissible, reasonable administrative interpretation of an ambiguous aspect of the Internal Revenue Code, and we defer to it. We also reject Mazzocchi's attempt to differentiate tax liabilities from other liabilities.
 
 
 38
 Finding all of Mazzocchi's other assignments of error to be without merit,[19] we will affirm the decision of the tax court in its entirety.
 
 
 
 [1]
 We have considered the Commissioner's contention that we lack jurisdiction to entertain the appeals of Mazzocchi and the estate of his late wife because no timely notice of appeal was filed on their behalf, but find it without merit
 
 
 [2]
 Under the cash method of accounting, the taxpayer reports income when received and expenditures when paid. In contrast, under the accrual method of accounting, the taxpayer reports income when the right to receive payment has accrued and the obligation to make payment has been established. Under Sec. 446 the taxpayer may select one of several accounting methods, including the cash or accrual method, to compute taxable income, so long as it reflects income accurately and the taxpayer uses the same method to keep its books. But the Internal Revenue Code is mute about the accounting method a taxpayer must use for computing its earnings and profits
 
 
 [3]
 All references herein are to the 1979 Code, unless otherwise specified
 
 
 [4]
 Section 316(a) provides:
 For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders--
 (1) out of its earnings and profits accumulated after February 28, 1913, or
 (2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made.
 Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recent accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301 applies, such distribution shall be treated as a distribution of property for purposes of this subsection.
 I.R.C. Sec. 316(a).
 
 
 [5]
 The term "earnings and profits" is used in various sections of the Code (its predominant use is in the treatment of dividend distributions by corporations), but is not defined therein. The Commissioner, however, has issued various regulations and revenue rulings in an effort to define it. See generally BITTKER & EUSTICE, FEDERAL INCOME TAXATION p 7.03, at 7-13 to 7-21. Briefly, earnings and profits are calculated by first adding to taxable income: "all income exempted by statute, income not taxable by the Federal Government under the Constitution [and] items includable in gross income under [the Code]," Treas.Reg. Sec. 1.312-6(b); certain items which a corporation may deduct in computing taxable income (such as percentage depletion and dividends received); and deductions based on artificial timing (such as accelerated depreciation and deferred income). Then, earnings and profits are reduced by items like expenses and losses which a corporation may not deduct from its taxable income (for instance, federal income taxes and, notably, capital losses in past years disallowed as deductions from taxable income under Subchapter P of the Code, see Treas.Reg. Sec. 1.312-7(b)(1)). Finally, various unusual financial transactions (for example, corporate distributions or changes in capital structure) may affect earnings and profits. See BITTKER & EUSTICE, FEDERAL INCOME TAXATION p 7.03, at 7-13 to 7-21
 
 
 [6]
 Compare Sec. 29.115-3 of Regulations 111 ("In determining the amount of earnings or profits ... due consideration must be given to the facts, and, while mere bookkeeping entries increasing or decreasing surplus will not be conclusive, the amount of the earnings or profits in any case will be dependent upon the method of accounting properly employed in computing net income."), reprinted in South Tex. Lumber, 333 U.S. at 500 n. 6, 68 S.Ct. at 698 n. 6 with Treas.Reg. Sec. 1.312-6(a), quoted supra at 928
 
 
 [7]
 Treasury Regulation Sec. 1.312-6 (1955) is, in all pertinent respects, identical to the current version
 
 
 [8]
 The memorandum states in relevant part:
 It is recognized that no uniform method of accounting can be prescribed for all taxpayers, and the law contemplates that each taxpayer shall adopt such forms and systems of accounting as are in his or its judgment best suited to his purpose. In ascertaining the amount of earnings or profits available for dividend purposes the books of account must be given due consideration, for they are presumed to reflect the earnings and profits available for dividend purposes. A corporation whose books of account are on the cash receipts and disbursement basis can only ascertain its earnings and profits by treating as gross income all items of income when received and deducting items of expense when paid.
 Although article 1542 of Regulation 62, construing section 201 of the 1921 Act, provides in part that in ascertaining whether a distribution was made out of earnings or profits of the taxable year there should first be set aside a proper reserve for the payment of accrued income and excess profits taxes, it seems manifest that there can be no accrual of such taxes by a corporation whose books of account are kept on the cash basis and that the provision is inapplicable [when the taxpayer maintains its books on the cash receipts and disbursement basis]. It is concluded under both the 1921 and 1924 Acts that, in determining the earnings or profits for any year available for dividends, not only must all items of expense paid during the year be given consideration but any income taxes paid during the year must also be treated as a charge against income, regardless of the fact that the taxes so paid represent additional assessments for prior years.
 Id. (emphasis added) (citation omitted).
 
 
 [9]
 Mazzocchi also relies on Rose v. Dobbs, 36 F.2d 464, 465 (5th Cir.1929), but that case is inapposite because the corporation used a hybrid system (part accrual and part cash method) in computing its income taxes, see Dobbs v. Rose, 27 F.2d 168, 169 (N.D.Ga.1928), rev'd Rose v. Dobbs, supra
 
 
 [10]
 None of these appellate decisions considered the Treasury regulation which controls the outcome of this case, even though it was in effect when the later two decisions (Demmon and Drybrough ) were handed down
 
 
 [11]
 Moreover, like the tax court, we discern no basis for differentiating between accrued taxes and other accrued liabilities when it comes to computing earnings and profits. See Webb, 67 T.C. at 1019. Besides our aforementioned deference to Sec. 1.312-6, which contains no exception for tax liabilities, we believe that granting tax (as opposed to other) liabilities special treatment would institute inconsistent accounting methods (the cash method for most items but the accrual method for tax liabilities) for items taken into account in computing earnings and profits. Such special treatment would unnecessarily add complexity to the Code, undesirably distort earnings and profits, and unjustifiably engraft an unprincipled exception onto the Code
 
 
 [12]
 General corporate law forbids a corporation from distributing dividends out of "capital":
 [E]ven in the absence of any statutory provision, [it is a settled rule] that a corporation cannot lawfully declare dividends out of its capital stock, and thereby reduce the same, or out of assets which are needed to pay the corporate debts. They can be declared only out of surplus profits, or, conversely stated, when the payment does not impair the capital stock of the corporation.... The mere fact that the assets still remain equal to the liabilities will not justify a dividend paid out of capital. Both the capital stock, paid in and outstanding, and the company's working capital, must be kept intact, and to that end, assets equal in value to the amount of both the capital stock and the working capital must be left and must remain in the treasury of the corporation after the payment of the dividend.
 
 
 [11]
 WILLIAM S. FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS Sec. 5329 (Lenore M. Zajdel ed., perm. ed. rev. vol. 1986) [hereinafter "FLETCHER CYC. CORP."]. Most states have codified this rule. For instance, in Delaware a corporation may only distribute dividends out of "surplus" (defined as net assets exceeding capital) or, if none, out of net profits earned in the current or previous year, but only if the rights of shareholders having preferences are not infringed. See DEL.CODE ANN. tit. 8, Secs. 154, 170(a) (1991)
 
 
 [13]
 The court added:
 Section 115(a) [the predecessor to Section 316] does not refer to the power of a corporation to distribute its earnings to its shareholders; that section relates only to what the stockholder must include in his "gross" income.
 136 F.2d at 814 (emphasis added).
 
 
 [14]
 The tax code is primarily interested in the taxpayer's ability to pay income taxes, in fairly apportioning tax liability amongst similarly situated taxpayers, and in promoting or inhibiting certain types of transactions. On the other hand, there are three separate reasons for the general corporate law doctrine against impairment of capital:
 Firstly, to permit the payment of dividends out of capital would work a fraud on creditors of the corporation, who have over-extended credit on the faith of its capital stock. Secondly, each stockholder is entitled to have the capital stock preserved unimpaired for the purpose of carrying out the object for which the corporation was formed. Thirdly, the capital stock is a trust fund for the security of creditors, and cannot be withdrawn or diverted to their prejudice.
 
 
 [11]
 FLETCHER CYC. CORP. Sec. 5329
 
 
 [15]
 We find Demmon unpersuasive for a further reason. The Demmon court observed that Sec. 316 defined a dividend as a corporate distribution made out of its earnings and profits of the taxable year " 'computed as of the close of the taxable year.' " 321 F.2d at 206 (quoting I.R.C. Sec. 316(a)(2) (1954) (emphasis added)). The court deduced that "[t]hese words must mean that all corporations, whether cash, accrual or hybrid, compute earnings and profits as of one time--the close of the taxable year," ibid. (emphasis in original), and that "[s]uch words imply accrual," ibid., because " 'as of' means tax relating to the year, and not tax incidentally paid during the year involved for some previous year or years," ibid. We instead interpret Sec. 316(a)(2) to refer to earnings and profits computed as of the close of the taxable year given the taxpayer's chosen method of accounting. Under the Seventh Circuit's reading, all relevant items of accrued income and expense--not just accrued taxes--would have to adjust earnings and profits, and furthermore all corporations would need to calculate earnings and profits employing the accrual method
 
 
 [16]
 As the tax court observed, "the statute itself seemed to place all taxpayers, regardless of their accounting method, on an accrual method for purposes of calculating their earnings and profits." Webb, 67 T.C. at 1019. The extant Treasury regulation, consistent with the Code, then provided that:
 "in ascertaining whether or not a distribution was made out of earnings or profits of the taxable year there should first be set aside a proper reserve for the payment of accrued income and war profits and excess profits taxes."
 49 F.2d at 712 (quoting Reg. 45, art. 1452).
 
 
 [17]
 Mazzocchi's attempt to distinguish taxes from other liabilities on the ground that taxes may not be deducted from income taxes is unpersuasive as mentioned supra at 930 n. 11
 
 
 [18]
 The taxpayer's election is subject to the caveat that the taxpayer may not select an accounting method which "does not clearly reflect income." I.R.C. Sec. 446(b)
 
 
 [19]
 The defendants challenge several factual findings made by the tax court. They take issue with the tax court's conclusions that Mazzocchi failed to substantiate the claimed business expenses for summer school bus drivers, school bus acquisitions, entertainment expenses, and renovation/refurbishment expenses for his property. After a careful review of the record, we conclude that Mazzocchi failed to meet the strict standards of substantiation dictated by Sec. 274(d) of the Code or to shoulder his burden of proving that the Commissioner's deficiency assessment was arbitrary or erroneous, see Resyn Corp. v. United States, 851 F.2d 660, 663 (3d Cir.1988)
 Mazzocchi also challenges the tax court's finding that he fraudulently underreported his taxable income for the relevant tax years. Employing the clearly erroneous standard of review, we conclude that substantial evidence in the record supports the tax court's finding of several indicia of fraud and that, when taken as a whole, the record adequately supports the tax court's ultimate finding that the Commissioner proved fraud by clear and convincing evidence. See I.R.C. Secs. 6653(b), 7454(a); U.S.TAX CT.R.PRAC. & P. 142(b); Estate of Mazzoni v. Commissioner, 451 F.2d 197, 201-02 (3d Cir.1971); O'Connor v. Commissioner, 412 F.2d 304, 310 (2d Cir.1969), cert. denied, 397 U.S. 921, 90 S.Ct. 908, 25 L.Ed.2d 102 (1970).
 Finally, Mazzocchi disputes the tax court's legal conclusion that his guilty plea in a criminal proceeding for one of the tax years involved in this civil proceeding collaterally estopped him from denying fraud for that year. Given our determination that the Commissioner carried his burden of proving fraud in each of the years at issue, we need not resolve this intricate question.